[Crim. No. 1616. In Bank.—November 23, 1911.]

## THE PEOPLE, Respondent, v. AGOSTINO BORELLO, Appellant.

CRIMINAL LAW.—EVIDENCE OF CONFESSION—EMPLOYMENT OF THREATS AND INTIMIDATION.—In a prosecution for arson, an alleged confession of the defendant is not admissible against him, on the theory that it was freely and voluntarily made, when the evidence shows without conflict that it was procured through the use by the sheriff and the district attorney of threats, intimidation, and invective, accompanied with coarse profanity, mental coercion, and false statements.

APPEAL from a judgment of the Superior Court of Amador County and from an order refusing a new trial. R. C. Rust, Judge.

The facts are stated in the opinion of the court.

James H. Creely, Alfred H. Cohen, and Milton Shepardson, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for Respondent.

LORIGAN, J.—This appeal was ordered here for further consideration after judgment rendered by the district court of appeal for the third appellate district affirming the judgment of conviction and the order of the trial court denying a motion for a new trial, from both of which the defendant appealed.

Defendant was accused and convicted of the crime of arson, and during his trial a purported confession made by him was admitted in evidence, and the principal point on this appeal is as to the correctness of the ruling of the court in that respect.

The crime of which the defendant was accused was the felonious burning, on February 5, 1908, of the "Summit House Hotel," situated on the road leading from the town of Jackson to the town of Sutter Creek, Amador County. It appears that this property was for several years and at the date of its destruction owned by one G. B. Vicini, who, in April, 1905, leased it at a monthly rental of sixty dollars, and for a term of six years, to C. Lepori and L. C. Bertin, who then, and at the time of the fire, were engaged in business in San Francisco under the firm style of Bertin & Lepori. These lessees placed this defendant and a man named Faracone in possession of the property who thereafter conducted it as a hotel and saloon. In July, 1906, defendant executed a chattel mortgage covering all the hotel and kitchen furniture, bar fixtures, etc., in the hotel and saloon in favor of said Bertin & Lepori to secure a promissory note for five hundred dollars executed by defendant to them; in March, 1907, defendant took out two policies of insurance on the personal property in the hotel for one thousand dollars each, one of which, however, expired by its terms before the fire. Thereafter defendant sold his interest in the hotel and saloon business to one Rossi who alone seems to have thereafter conducted it until a few days before the fire when he abandoned the business, closed the hotel and left that part of the country. A few days afterward and while the hotel premises were vacant they were destroyed by fire. The defendant for several months before the fire had been living in San Francisco but, a few days

before it occurred, had been seen in the vicinity of the Summit House, once in company with Lepori of the firm heretofore mentioned—lessees of the hotel; another time with one Manzo, a resident of San Francisco; and some eleven months prior to the fire defendant had endeavored, but unsuccessfully, to prevail on one James Bryant to burn the hotel, offering him two hundred dollars to do so.

There was considerable other evidence in the case—conduct on the part of the defendant and circumstantial evidence—relied on by the people to establish the guilt of the defendant, but no positive evidence except his alleged confession directly connecting him with the commission of the crime. We make no further reference to the evidence because our purpose has been to only state such of it as will make intelligible the matters to which the confession of defendant is claimed to have been addressed, and the condition and circumstances under which it was made.

It was not claimed by the people that the defendant himself actually set the hotel on fire. The theory was that the defendant, at the instigation of Lepori, engaged a man named Manzo to go from San Francisco to burn it and that he actually did so, the motive prompting Lepori being that by the destruction of the property the firm of which he was a member would be relieved from further payments on their lease, which still had three years to run and was an unprofitable investment, and the motive of defendant was to secure the insurance money on his personal property situated in the hotel.

Now as to the conditions and circumstances under which the confession of defendant was made.

On February 8, 1908, three days after the hotel was burned down, the defendant, who had left San Francisco for Jackson, Amador County, was arrested by the sheriff of that county at Martell, a railroad station a short distance from Jackson, and taken to the county jail. The next evening, Sunday, February 9th—he was brought from the county jail to the office of the district attorney of the county, where were present the district attorney, the sheriff of the county, a deputy sheriff, the official stenographer of the superior court, and a constable of Amador county, the latter being present at the request of the district attorney, to act as interpreter, the defendant being an Italian,

who, though able to speak the English language, did so brokenly. This interview in the district attorney's office lasted at least two hours and a half, although some of the parties present testified that it lasted nearly five hours. It resulted, after defendant had been interrogated by both the district attorney and the sheriff, in what purported to be a confession of the defendant. The statement made by him was dictated to the stenographic reporter, who transcribed it at once. It was this statement which was admitted in evidence as the confession of defendant and in which he admitted having taken part in the burning of the building, having at the instigation and request of Lepori employed a man whose name is not disclosed in the written confession who agreed to and did burn it.

On the preliminary showing the sheriff, district attorney, and the deputy sheriff testified generally that no promises were held out to defendant or any threats or intimidation or other improper means used to procure him to make the confession. As to what took place at the interview the district attorney testified: "I was in that meeting or investigation for a period of about two hours. Both Mr. Gregory and myself asked defendant Borello some questions. Of course he willingly made the statement, the whole statement himself, and then we asked him as to little points and one thing and another that we wanted to find out and that took up about two hours. . . ." Mr. Willis, the stenographer who was present during all the interview which culminated in the making of the alleged confession, was not called by the prosecution at the preliminary showing and his presence as a witness had not been required by it.

On the part of defendant he himself testified, among other things, that both the sheriff and district attorney told him that it would be better for him if he would tell the truth about the burning of the hotel; also that if he would do so both he and his brother Marco (who was then under arrest also accused of burning the hotel) would be allowed to "go free;" that the district attorney told him that he did not want to keep him in jail, but that he wanted to get Lepori. He stated further that the sheriff had told him that his brother Marco had made a full statement of the cause and origin of the fire, and that the sheriff stated other facts tending to convey the impression

that in this statement so claimed to have been made, his brother had implicated defendant in the crime and that if defendant would not tell the truth and sign a statement, his brother Marco could get fourteen years. Other matters were testified to by defendant and other witnesses on the preliminary showing tending to support the claim of defendant that his confession had not been procured from him freely and voluntarily. All these statements of defendant and the other witnesses in his behalf were specifically denied by the sheriff and district attorney.

The prosecution then offered the confession of the defendant in evidence to which the defendant objected on the ground that it had not been shown to have been freely and voluntarily made. Before a ruling thereon the defendant asked for a continuance in order to procure the testimony of Mr. Willis, the stenographer, who was present when the interview between the sheriff, district attorney, and the defendant was had, and the alleged confession was obtained. The court refused the continuance and said: "If you gentlemen want to argue upon the evidence that is in you can do that, with the understanding that hereafter, if Mr. Willis comes, you can introduce his evidence. If the court should sustain your objection, there will be no necessity for the evidence of Mr. Willis. If the court should overrule your objection, and admit the confession, you can have Mr. Willis hereafter in rebuttal on your case, and the court then can get the benefit of his evidence as well as the jury; and if necessary, after such a showing is made, the court can rule at that time, withdraw the confession from the jury and instruct them not to entertain it. I think that is the only way out of it."

After argument, the court over the objection of defendant, admitted the confession in evidence, which confession consisted of but three pages of the record, and amounted only to a declaration by defendant as heretofore stated, that Lepori had engaged him to employ a man, to be paid by Lepori, to burn up the hotel and that defendant employed such a man and the hotel was burned.

At a subsequent session of the court, the defendant in the meantime having procured the attendance of Mr. Willis, the official stenographer of the court (not then, however, reporting the trial of defendant), calling him as a witness. While

the testimony on the preliminary showing on the part of the prosecution was that in the interview with the defendant on the 9th of February, the defendant made his statement freely and willingly, and that the sheriff and district attorney "then would ask him as to little points and one thing and another that he wanted to find out," the notes taken by the stenographer and from which he testified, show very clearly just what took place, and how the interview with or investigation of the defendant was held as far as the notes speak on the subject. What the stenographer took down he had not been requested to do by any one, but did it of his own volition. He testified that all the public officers heretofore named were present in the office of the district attorney with the defendant and that the latter was questioned by both the district attorney and the sheriff directly, and also through the medium of an interpreter, and that they were all in the office of the district attorney engaged in that matter from about a quarter to seven in the evening until half past ten or eleven o'clock that night. All the conversation which was had between the officers, the interpreter, and the defendant was not taken down by the stenographer but the greater and more important part of it was, and shall be referred to as the undisputed evidence in the case of what actually took place at the interview and bearing on the question whether the confession was freely and voluntarily obtained from the defendant or not. Before doing so it is to be said that when this appeal was before the district court of appeal for determination that court, as appears from its opinion, was strongly persuaded that if the confession of defendant had been obtained solely through the declarations of the sheriff, and his conduct and that of the district attorney on the evening of the 9th, as disclosed by the stenographer Willis, such confession would have been shown to have been improperly obtained and inadmissible in evidence. That court was of the opinion, however, that the declarations of the defendant on the evening of the 9th of February when the notes were taken and the confession signed by the defendant were but repetitions of admissions of guilt which he had made to the officers—the sheriff and district attorney—the night previous—February 8th—and having voluntarily confessed the crime on the previous evening, the subsequent conduct of the sheriff and the district attorney on the night of February 9th,

however threatening or otherwise reprehensible it might have
been, could not be said to have anything to do with causing
defendant to then admit his guilt, because he had already
admitted it on the previous evening. But there is not a
particle of evidence in the record that the defendant made
any confession of guilt or stated any circumstances of an in-
criminatory nature on the evening of February 8th or at any
other time than during the interview of February 9th. No
such claim is made in the brief of respondent. Nowhere in the
record is there even a suggestion that he had done anything
of the kind excepting as might appear from some declarations
of the sheriff and district attorney in questions they asked
him on the evening of the 9th and which imported that the de-
fendant had made them the previous evening. But in as far as
any questions by the sheriff or district attorney stated or
implied that defendant had made any incriminatory admis-
sions on the evening previous to February 9th such statement
or assumption was untrue and was a species of deception em-
ployed to embarrass, disconcert, and entrap the defendant,
because it affirmatively appears from testimony directed
specifically to the fact that the defendant made no admissions
of guilt or statements of any incriminatory character at any
time previous to the evening of the 9th of February. This is
directly shown by the testimony of the sheriff and district
attorney themselves who explicitly state that on the evening
of the 8th the defendant would not talk about the burning of
the hotel, denied any knowledge about it, the district attorney
testifying that while he asked and the defendant answered
some unimportant questions, that the important ones which
he asked him were not answered by the defendant at all.

Recurring now to the testimony of Willis as to the actual
occurrences and the true situation and circumstances under
which the alleged confession was obtained. Reasonable limits
of an opinion preclude a detailed statement of all that
occurred. It appears that on the afternoon of the 9th the
district attorney had visited the defendant in jail; that the
defendant made no statement to him but said: "I will see you
tonight," and that it was on account of this statement that
defendant was subsequently brought to the district attorney's
office where the various officers of the county heretofore re-
ferred to were assembled. If defendant intended by the ex-

pression "I will see you tonight" to convey the impression that he would then make a confession to the officers of any connection with the offense charged, it is quite apparent that he abandoned any such intention before he was brought before them. It does not appear that he was then asked to make, nor did he make, any spontaneous statement of his connection with the burning of the building, but on the contrary the sheriff and district attorney at once proceeded to interrogate him respecting the matter and this investigation on their part continued for a long period of time before he made any confession respecting his connection with the commission of the offense. His general attitude when he was brought in and which continued during the examination and while he was being subjected to examination by the officers, is stated by the district attorney himself: "He would hem and haw about it. . . . When I say he hemmed and hawed, I mean he would not say anything. He was holding his head down a great deal. One minute he would want to tell and the next minute he did not want to tell. . . . The reason why he wanted to tell I could not tell you. I would say it was because he was scared, and then he would want to tell and hem and haw about it, and finally came out and told the whole story. . . . Mr. Gregory (the sheriff) and I just kept on asking questions relating to the matter."

But it is these very questions put by the sheriff and district attorney, the continuous and searching examination to which the defendant was put by both of them in an endeavor to wring out a confession when it was apparent that he was not disposed to make one, and their statements and conduct toward him, which showed that the confession was not freely and voluntarily made, but was the result, of threats, intimidation, invective, accompanied with coarse profanity, mental coercion, and false statements used to procure it, the employment of which the law absolutely discountenances and prohibits.

The notes of Willis—the correctness of which are not questioned—show that the sheriff and district attorney, principally the former, in English, and through the medium of the Italian interpreter, interrogated the defendant persistently for upwards of an hour, if not for several hours; that they persisted in making repeated inquiries on the same matters

to which the defendant gave them what in their judgment
were unsatisfactory replies to such an extent as to elicit from
the defendant through the interpreter this declaration to the
sheriff, his interrogator: "He says he cannot say anything
more than he knows; it looks as if you are not satisfied with
what he says," responded to by the sheriff with, "He says one
thing and then he wants to take it back."

During the long inquisitorial ordeal through which he was
put by the officers and before he had made any admission of
guilt, he was told by the sheriff that he would have to tell all
he knew and was accused by both the sheriff and district
attorney of not telling the truth in the answers he was giving.
The sheriff declared to him that he had absolute proof of his
guilt and could convict him before a jury; charged him with
another crime in connection with the crime of arson; declared
that he could prove he had offered a man money to burn the
hotel and could prove that fact whether it was so or not;
stated that they had sufficient proof without any confession
on his part to convict him; that his brother Marco had made
statements in which he implicated the defendant in the burn-
ing of the hotel and if his brother went back on it he would
go to the penitentiary for fourteen years; they asserted that
he had made statements to them the night before of an in-
criminatory character, when in fact he had made no such
statements at all; charged him with repudiating in his answers
the statements declared to have been so previously made and
indulged in coarse profanity throughout their examination
relative to the statements he was making and to emphasize
their disbelief in their truth.

Supplementing these references to the conduct of the officers
during the examination with a few extracts from the notes of
Willis: Almost at the beginning of his examination when the
defendant had stated, among other things, that he did not
know the name of the man who it was assumed by the officers
had actually burned the hotel, the district attorney declared:
"Don't you think if I told you those things, then you would
ask me what was the man's name and I would say, 'I don't
know,' you would tell me I was a damned liar. That is what
you would say. You would tell any reasonable man under the
sun; you can't tell any man that has got a damned ounce of
sense, and tell them that state of facts, that you don't know a

man's name, he would be a God damned fool if he believed you."

Following a large number of interrogatories by both the officers based on purported statements made the night before by the defendant, which questions however elicited no answer from the defendant incriminating himself, he was further asked why he had said his brother Marco had gone to San Francisco with him, to which he answered: "It don't make any difference." The district attorney then said: "I understand you now, that you don't want to tell the truth, that is the way I understand you."

A. "I am telling the truth."

Q. "You don't want to when you say it is none of your business, when your brother go to San Francisco. Suppose my brother and I go to San Francisco and a man asked me whether I knew. You know damned well I would lie if I said I didn't know."

A. "You ask my brother."

Q. "Does he tell the truth? You don't. Can't you tell the truth?"

A. "Yes."

Q. "Don't you know whether he went down with you? It is the God damnedest proposition I ever heard of."

It also appears from a consideration of the notes of Willis that after an unremitting, searching, and protracted questioning by the officers in regard to the burning of the hotel had failed to draw any admission from defendant of his connection with it, he was finally asked who had telegraphed to Lepori at San Francisco that the hotel had been burned. Defendant made no answer. Asked if he knew the name of the person who had done so and answering in the negative, the sheriff addressed him as follows: "I ain't going to let you go. I won't lie to you. I got too much proof. I am not going to let you go, that is all there is about it. You are going to stand trial as I told you last night, and you don't have to tell me anything if you don't want to, but if you want to tell me anything, it must be free and voluntary. I want the truth. I want to know the truth. That is all I do want. Now, do you think that when I can prove that you offered a man $200—I can prove it whether it is so or not—that you offered a man $200 to burn that place, that you told him that you had got

the coal oil, that you went down to Rose's and had the place insured, and you came back and told the man it was alright, and he told you that you were crazy? Now, I can prove that, and when I· can prove that you came up here and shipped away the goods and I can prove that you said. Lepori told you to ship the goods away, and I can prove to you that you told other people that Lepori told you there was going to be a fire, and if your brother goes back on it, he will go to the penitentiary for fourteen years; I don't lie to anybody. I don't lie to anybody. I am telling you what he said. But he said that. I am not telling you all that your brother said. I am not going to tell you all your brother said. I will tell you right now I won't tell you all your brother said; but you did tell your brother that, and your brother swore that you told him that Lepori was going to have a man come up here to set that house afire. I can prove that by every man in this room. They all heard it, by God, every man in this room heard that. Now, I can prove that you went to work and you did ship this stuff as Lepori told you. I can prove that man came up here from San Francisco with you and that you stayed here with him and stayed until your brother came up and you—at the Summit House—and when your brother came up here, then you took your brother into his bedroom, the first night, and told him this story. Now, you shipped this stuff away, and you shipped stuff that didn't belong to you— not a God damned bit of it. That cash register didn't belong to you or Lepori. It belonged to Rossi. You said this that you sold it to Rossi, and you shipped the wine and you shipped the bedding and you shipped the mineral water, and by God, it is selling goods that don't belong to you. That belongs to Rossi and Rossi has got a bill of sale for that."

Here the district attorney. intervened with: "When you went to San Francisco, you went with Rossi and your brother and they got off at Galt for Sacramento. You told us that Lepori told you to pack that stuff, and that Lepori didn't own it any more than you did. You told us that Lepori told that when you went back to San Francisco. You went down to Lepori's store to tell him that you had shipped that stuff and you was also going to tell him that the man that went up with you was at your brother's house. Do you suppose that when I can prove that—"

Here the sheriff interrupting the district attorney proceeded: "Do you suppose now that when I can prove that to you that any jury in the world is going to let you go? You have got to show where you got all this news. That is all there is about it. You have already told us that Lepori told you, but that won't clear you. You asked me if you could go, and I told you no. I am telling you I can't turn you loose. Suppose I turned you loose with all that evidence against you, what would people say about me? Here is a God damned pretty sheriff and a God damned pretty district attorney, to have all this proof against a man and turn him loose. . . . If he (defendant) wants to say anything, he can say it now, because if he don't I am going to strike out tomorrow morning and I am going to round up this whole God damned bunch. I can't stay here for a week, and I am not going to do it. If he wants to say anything, he can say it now. I want to say to you right now, Borello, that if you don't want to say anything you don't have to. If you don't want to make any statement, you don't have to, but if you do it must be free and voluntary on your part, without any concessions, promises, rewards or anything else. Now, if you want to do it, you can."

Immediately following these declarations by the sheriff and district attorney the defendant, in response to further questions, stated that Lepori had instigated the burning of the hotel and had asked him to employ a man to do it, Lepori agreeing to pay the man a hundred dollars if the destruction was successful; that the defendant employed one Dominico Morozi, or a man having some such similar name—defendant could not tell exactly—to do it; that he took him to the Summit House from San Francisco for that purpose, left him there, and the hotel was burned.

Additional excerpts from the notes of Willis might be given showing highly improper conduct on the part of the officers to procure a confession from defendant, but the above will suffice. In this connection it is to be observed that in the lengthy and forceful declaration of the sheriff to the defendant last above quoted the sheriff did not specifically state to the defendant how far the statement of his brother implicated him in the burning of the hotel, but there can be no reasonable doubt but that the sheriff intended to convey the idea and have the defendant believe, as he naturally would, that his brother

had made a statement to the sheriff directly implicating him
in it. The defendant knew that his brother Marco was under
arrest and had made a statement, but did not know what it
contained. No other meaning or intention could be taken by
defendant from the language of the sheriff when referring
to the statement made by Marco "I am not telling you all your
brother said. I am not going to tell you all your brother
said. I will tell you right now I won't tell you all your
brother said; but you did tell your brother that and your
brother swore that you told him that Lepori was going to
have a man up there and set that house on fire" except that its
emphatically reiterated character was to suggestively and in-
sinuatingly impress the defendant with the belief that his
brother's statement had in fact implicated him.

No attempt was made on the part of the prosecution to ques-
tion the accuracy of what is shown by the testimony of Willis
to be the exact circumstances and method employed by the
officers to procure the confession.

On this showing made, the defendant moved the court to set
aside the order theretofore made admitting the confession in
evidence, under the right reserved to him by the court to do
so at the time the confession was originally admitted in evi-
dence, and on the ground that it was not freely and volun-
tarily made, which motion the court denied. This was error.
The court should have granted the motion. While upon the
preliminary showing made by the prosecution and upon which
the admission of the confession was made, it appeared in ans-
wers to general questions that the confession had been obtained
freely and voluntarily, the uncontradicted testimony of the
stenographer showed exactly how it was obtained and by what
method and conduct on the part of those who had testified to
its free and voluntary character, and conclusively showed that
it was not so made, but was obtained by a method inquisitorial
in its nature and of the "third degree" in character; the as-
sumption of a dominating and browbeating attitude of the offi-
cers toward the defendant, and the employment of deceptions,
threats, and intimidations, emphasized with coarse profanity.

That a confession so extorted cannot be admitted in evidence
is firmly established in the jurisprudence of this country.
(*Brant* v. *United States,* 168 U. S. 532, [18 Sup. Ct. 183, 42
L. Ed. 568]; *People* v. *Loper,* 159 Cal. 6, [112 Pac. 720].)

The judgment and order appealed from are reversed.

Henshaw, J., Melvin, J., Shaw, J., and Beatty, C. J., concurred.

SLOSS, J., concurring.—I concur. The methods employed to induce the defendant to confess were, I think, more extreme and unfair than those which were held by a majority of the court in the Loper case to require the exclusion of the confession there obtained. It is impossible in the present case to avoid the conclusion that the confession was forced from the defendant by means of intimidation. Apart from anything else, there was a direct threat that defendant's brother would be subjected to a long term of imprisonment for perjury if he did not so testify as to fasten upon the defendant the guilt of the crime with which he was charged. A confession resulting from the use of such means cannot in any fair sense be said to have been free and voluntary.

Angellotti, J., concurred.