STATE OF IOWA, Appellee, v. WILLIAM THOMAS, JR., Appellant.

RAPE: Evidence—Weight and Sufficiency. Evidence reviewed, and
1  held insufficient to support a verdict of assault with intent to rape.

CRIMINAL LAW: Evidence—Nonvoluntary Confessions. Confessions
2  obtained by *any* sort of threats or violence, or by *any* direct or
implied promise or inducement, however slight, are wholly inadmis-
sible. If the fact of threat or violence or inducement be substan-
tially undisputed, the court must peremptorily exclude the alleged
confession. If, however, the fact question be fairly in issue, the
jury may be allowed to pass thereon. Evidence held to require
the absolute exclusion of an alleged confession.

*Appeal from Dubuque District Court.*—D. E. MAGUIRE, Judge.

JUNE 21, 1922.

THE defendant was indicted upon charge of rape, committed
on the person of one Dorothy S. Hoffman. Trial was had to a
jury, which returned a verdict of guilty of assault with intent
to commit rape. Motion for new trial was denied, and defend-
ant, having been sentenced to imprisonment in the penitentiary
for the term of 20 years, appeals from said judgment.—
*Reversed.*

*Anna M. Utt, G. A. Barnes,* and *C. E. Wheeler,* for ap-
pellant.

*Benjamin J. Gibson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, for appellee.

WEAVER, J.—The complaining witness is a married woman,
24 years of age, and at the time of the alleged assault, she was
living with her husband on a farm in Dubuque County, not far
from the town of Dyersville. The defendant,
William Thomas, Jr., commonly called "Jim-
mie," by which name he is spoken of in the
record, is an unmarried man, 33 years old; and at the time in
question, he was living with his parents on a farm adjoining
the one occupied by the complaining witness and her husband,

1. RAPE: evidence:
   weight and suf-
   ficiency.

Leo Hoffman. In the same house with defendant lived his father, mother, three sisters, and three brothers. Of the Hoffman family there were three members: the complaining witness, her husband, Leo, and his brother, Raymond. On September 22, 1920, Leo and Raymond drove to Dyersville, with loads of wood. Concerning the occurrences following the departure of her husband and brother-in-law, we quote from the woman's direct testimony, as found in the abstract, as follows:

"On the 22d of September, 1920, I was at home in the kitchen. I remember that morning. My husband and his brother were home early in the morning. After breakfast, they went to Dyersville, with a load of wood,—both of them, Raymond and Leo. Leo is my husband. After they started, I was at home alone. They started about a quarter after 8. I was beginning to iron. We have a telephone in the house. I used the telephone that morning, after my husband and his brother started for Dyersville, about twenty minutes after. I called up Mr. Peter Hoffman at Dyersville, and talked with him. Later that morning, my attention was attracted by a person that came to the house. There was a heavy tramping over the porch, and he said, 'Mother, mother, let me in;' and then he went to the window, and he said, 'Mother, mother, let me in, or I will shoot you.' Then he went to the door again and kicked that in, or cracked it in three places. I didn't say anything, but I was screaming all the time, and hollering for Leo. Then he went to the window and pointed a gun at me, and said, 'Mother, let me in, or I will shoot you,' and then tried the door, pushing and kicking on it, and then went around to the other side of the house; but I couldn't get that door locked quick enough. Our house faces south. The kitchen is on the east and north. The door that he kicked was on the east side. The other door is on the west. There was a door at that time on the west side of the kitchen. I didn't see him go around. I heard him walking on the porch. I ran to the door, but couldn't get it shut quick enough. When I went to the west door, he pushed the door open and grabbed me by the throat, and said, 'Mother, let me in, or I will shoot you.' When he got inside the door, he hollered, 'Hands up.' He fought with me. He had me by the throat,

and said, 'Mother, be still, or I will shoot you.' He shoved and threw me around, and got me on the floor finally. I was fighting and screaming for help. I fought with my arms. He had hold of my arms. I couldn't fight very much. I tried to get away from him. He got me on the floor and strapped my hands. He put them to my back crossways, and strapped them as tightly as he could get it,—that it burned. While he was placing that strap on my hands, I was fighting and struggling as much as I could, to get away, and screaming. After he had strapped my hands, he turned me over on my back. He then covered my face with my clothes. He put them over my head and tucked them under my neck. I was fighting and struggling all I could. I was weak. This man did not say anything while I was on the floor. He had his face covered with a veil, and had a blue faded overall on, and had his shirt sleeves slipped up from here. He had no shirt on; he had just his undershirt on. He had the bib turned in on his overalls. It was a cream colored veil. I could not say whether it was a large or small veil. He had it wrapped around his head. It was tied over his face, and he had it tied in the back in a knot. Then he unstrapped my hands and rushed out of the door, slammed the door shut, and never said a word. He just unbuckled the strap; he didn't take it off my hands. He left by the west door. I felt weak, and was scared. The next thing I did was to go to the telephone. Then I went upstairs and dressed, and combed my hair. I then went downstairs and went over to Thomas's. That is about 40 acres away. I went down the road. I walked. I was in a weak condition, and was not able to run. When I got down near the Thomas home, I saw William Thomas, Jr., standing by the gate. I said: 'Is Myrtle there?' I told him to tell Myrtle to come over; that there was a tramp in the house; and that I was scared to stay alone. Both of the girls and him came down, and I sat down by the telephone pole to rest awhile. I was weak. I sat down about two minutes, and then the girls said I should go into the house and sit down. I went into the house. Myrtle Thomas, Adeline Thomas, and the defendant went in with me. I laid down on the couch. I was weak and nervous. The girls asked if I seen a man, and I said, 'Yes;' and they said, 'What did he

look like?' and I said I couldn't tell. The Thomas girls asked me what happened, and I told them. Q. What did you say? A. Well, Myrtle asked me what he had done, and I told her, 'He got the best of me.' The defendant, William Thomas, went into the room in the Thomas home with me. He stayed in the room a while, and then he went out, and then came in and sat down again. He didn't say anything to me. He made no inquiry of this man that I complained of. He left the room after a bit. I don't know where he went to. Then Myrtle Thomas telephoned Mr. Peter Hoffman, in Dyersville. My husband had started that morning for Peter Hoffman's home with some wood. I stayed in the Thomas house that morning about half an hour. When I left, I went home. The defendant took me home. I did not ask him; the girls told me that he said he would take me home. He took me home in an automobile. After I got down to our house, I went in the house. Defendant went along. He sat down, and the strap was lying on the floor, and I said, 'There is that darned strap,' and he said, 'That looks like a strap from the boy's harness,' and I didn't say anything more then. I was weak and scared. I didn't feel like talking much. It seems to me that it was about a half hour before my husband got home. Defendant said, 'Shall I see if the wires are cut around the house?' and he went out, and then he said, 'I don't see any cut around there,' and I said: 'No, you stay here; I am afraid to stay alone.' That was the first time the wires were talked about. When my husband came home, he came into the house without unhitching the team. Leo asked the defendant, 'What happened here?' and he said, 'Someone was trying to tackle Dora.' Leo said, 'We ought to drive down towards Worthington, and maybe we could find him along the road somewhere,' and he said he didn't want to have anything to do with that; that he was gone a long time ago. That was about noon. My husband put the team away. I got dinner. I said to my husband, 'You don't need to say anything about it, but I think this was Jimmie Thomas.' That was at the dinner table.''

On cross-examination, she said, among other things:

''When this man came into my house and attacked me, his face was all covered up. I could not recognize him at that time.

* * * The minute he left the house, it came to my mind it was Jimmie Thomas, but did not know him while the attack was going on. Some time afterward, I made up my mind it was Jimmie.''

The cross-examination further continued, as follows:

''Q. Now, if you thought it was Jimmie that raped you, you wouldn't have gone right up to his house and make complaint about it and get help, would you, if you had thought it was him? A. Yes, I would, anyhow. I would have gone right up to his house if I had known it was him. I wasn't afraid he would hurt me, after he had raped me. Jimmie brought me down to the house. I didn't object to riding in the same seat. It was a two-seated car, and Jimmie was seated at the wheel, and as a matter of choice, I climbed right in beside him, and rode to my house; and that was within a few minutes from the time I say he raped me. I made no objection. I didn't say nothing to him; I didn't want to, neither. Q. Now, after this brute came in and tied your hands behind you, and threw you on your face to do it, and then turned you over on your back, and after—in spite of your crying and your begging and your shrieking—he had sexual intercourse with you against your will, do you want this jury to understand, with that knowledge in your mind, that you went right up to Jimmie Thomas's house, and that you talked with him and his sisters? A. Yes, sir, I did. I had it in my mind that it was Jimmie Thomas that raped me, before I went up to his house. I didn't make any accusation against him when I saw him up at the house. I did not accuse him with it. His sisters were present. I didn't tell them that their brother had just violated my person. Didn't say anything of that sort. I thought it was Jimmie when I got up there. I noticed it right on his clothes right away,—the way he had his cuffs slipped up, and everything. I didn't want to say anything; I thought I would let this thing go, and see once how he would act. I was afraid of him. I certainly knew he was a brute. When I wanted somebody to go back to the house with me, I rode down with Jimmie, alone. I wasn't afraid of him. Of course he was the man that had just raped me; and still I wasn't afraid of him. I didn't want to be raped again,

but still I thought I would take a chance. I could have just as well ridden in the rear seat. They opened the door for me, and I climbed right in on the front seat with Jimmie. When I chose to get in by the side of Jimmie in the front seat, for him to take me down to my house, I wasn't afraid of him; and yet he had raped me within sixty minutes. I didn't think he would rape me again, and he didn't. And I stayed down there all alone for an hour with him, down at my house. I was nervous all the time. Q. Why hadn't you asked his sisters to ride down with you, so as to keep the brute away from you? A. Well, they were afraid to. Q. Were they afraid of Jimmie, too? A. Yes, they were. Q. I see you are smiling,—you weren't afraid of Jimmie, were you? A. Yes, I was. When I got up to Jimmie's father's house, I talked with Jimmie's sisters. I told them somebody got the best of me. I said he tried to get the best of me. He got the best of me, but I didn't tell them that. I didn't say to them twice: 'He tried to get the best of me, but I fought him so hard that he didn't.' I told my relations that he had intercourse with me, but I didn't know whether he had completed it. After I got up to Mr. Thomas's house, I told the girls, in the presence of Jimmie, that I didn't know who the man was. And still I say to the jury now that I thought it was Jimmie at that time. I told the girls that I couldn't say who it was, because he had a veil over his face. I told the girls an untruth then, because I didn't want to tell them. I thought they could find it out. I want this jury to understand that I told this man's sisters that I didn't know who it was, when, as a matter of fact, I did then know who it was. Before I started from the Thomas house to go home, I told the girls to tell him to go down to my house and see if he could see anything. Q. Well, what did you do that for? A. Well, that was all right. Q. Well, maybe—I don't know. A. I wanted to see how far he would go. He didn't go any farther than over the hill; he didn't go very far. Q. As a matter of fact, you didn't suspicion that Jimmie was the man that raped you at that time, did you? A. Yes, I did. Q. And still you sent him down to see if he could find the man? A. Yes, I did. Q. Will you kindly tell the jury why you did that? A. I

wanted to see if he would say anything—see if it was him—see if he would go. Q. What good would that do you, to see if he would go down there or not? A. Well— Q. Don't you want to answer that, madam? A. No, sir. I and Jimmie went down there together, riding side by side, and Jimmie stayed with me until my husband came home, at my request. I asked him in the house where I and him would be alone. I wasn't afraid of him. On the 22d day of September, 1920, I was ironing, when this man with a gun came to the house; and then these terrible things that I have told about occurred. And then I finished my ironing, that same day. And after that, after I had been mishandled so terribly, I put up three pecks of tomatoes. I was screaming as loud as I could, from the time the man came until he went away. This occurred in the forenoon, around half past 9. He was at my house about 15 minutes. He got away from my house about 15 minutes to 10. After he left the house, I changed my shoes, and I combed my hair, and put down three window shades, and locked all the doors, and then walked a quarter of a mile, up to Thomas's."

The foregoing is, of course, not the whole of the case made by the State; for there is also a very considerable volume of the testimony relating to circumstances supposed to have relevance to the issue tried. Aside from the story told by the woman and the testimony of the defendant in denial thereof, the evidence of the commission of the offense and of the alleged connection of the defendant therewith is wholly circumstantial. The errors assigned by appellant for a reversal of the judgment against him are quite numerous, but for the purposes of this appeal, they may be grouped and considered under three general heads: (1) Errors in rulings upon the admission and exclusion of evidence; (2) errors in the giving and refusal of instructions to the jury; and (3) the insufficiency of the evidence to sustain the verdict. To these we give attention in the order named.

I. Of the exceptions to rulings upon the admissibility of evidence, the one most earnestly pressed upon our consideration is directed against the admission in testimony and submission

2. CRIMINAL LAW: evidence: nonvoluntary confessions. to the jury of a writing purporting to be a confession of guilt by the defendant. The objection is grounded upon the familiar rule that a confession of guilt by a person charged with crime is admissible in evidence against him only when it has been freely and voluntarily made, without having been induced by any promised benefit or fear of any threatened injury. *State v. Chambers,* 39 Iowa 179; *State v. Jay,* 116 Iowa 264; *State v. Fidment,* 35 Iowa 541.

It is appellant's contention that the writing in question was extorted from him by force and coercion exercised by the sheriff and county attorney, assisted by numerous other persons, and was neither freely nor voluntarily made. It is his further contention that the inadmissibility of the writing as evidence was conclusively established, and that the court should have so ruled, as a matter of law.

To the proper consideration of this assignment of error, it is necessary that we refer as briefly as may be to the record of the proceedings. It appears that, on the day following the alleged assault, the husband of the woman, or some of his friends, reported the incident to the sheriff, who visited the neighborhood and entered upon an inquiry into the matter. The sheriff testifies that the prosecuting witness told him her story, and told him who "she suspicioned" was the offender, and that "she thought it was Jimmie Thomas." On the following day, the sheriff and county attorney came back, and renewed the investigation. The Thomas family, including the defendant, was attending a picnic, near Dyersville. The sheriff and attorney then went to Dyersville, and arranged to have the Thomases called to meet them at the town hall, where they quizzed the several members of the family privately and separately, the interview extending into the night. Defendant protested his innocence, and expressed a willingness to go to the home of the prosecuting witness and meet her face to face; but the sheriff preferred that such meeting should be had in the daytime, when the light would be similar to that of the time of the assault. Defendant promised to go whenever called upon. The record is not clear as to the order of some of the events for several days,

but it is evident that the sheriff and attorney continued their investigation in some form until Tuesday, September 28th, some six days after the date of the alleged offense. No information was yet filed or warrant issued for defendant's arrest. On the evening of Monday, September 27th, these officers, still without warrant, went to defendant's home, and asked him for the clothes he had worn on the Wednesday before. He complied promptly with the request, gave them the clothing, and promised to go with them to the Hoffman home on the next day. The proposed meeting at the Hoffmans' appears to have been arranged by the officers, for the purpose of obtaining, if possible, a confession from the defendant; though, of course, he was not advised of that intention. That the meeting was to be held was given some degree of publicity. When the sheriff and attorney arrived at Hoffmans' on the following day, defendant had not yet appeared; but there was already a considerable number of people gathered there. Learning that defendant had gone to town, the sheriff drove out to meet him. Before going, however, the officer says:

"I told these people to hide their automobiles. We didn't want to have him see the crowd there,—might have a tendency to scare him, and we didn't want him scared. I was careful to have them hide their automobiles, so as not to scare Jimmie; because I expected it would be used in his defense. They must have put their autos up around the barn. They were not there when we came back. I knew, when I brought this boy up there for that confession, there was liable to be a lot of people there. I objected to that. I told them to get out of the way and hide, and stay out of the way. I knew the crowd would have a tendency to scare Jimmie. * * * I didn't want him scared, because, if he saw the crowd around there, and they would say something to him, the people were pretty well riled up there, and they might do something to him, and I didn't want that to happen."

The sheriff then drove out, met the defendant coming from town, and both drove back to the Hoffmans'. Up to this time, during the several days of investigation which had taken place, there appears to have been no manifest disposition on part of defendant to avoid it, or to hesitate in giving any explanation

called for. On arriving at the Hoffmans' on this occasion, he saw enough of the gathering to excite his apprehension; and, on being conducted into the house, and finding that his brother, who had accompanied him, was to be excluded from the room, and that he was to be left alone with hostile inquisitors, he seems for the first time to have become alarmed, and directed his brother to call Mrs. Utt, a lawyer at Dyersville, who had been attorney for the family in other matters. It may as well here be said that, on the arrival of the attorney, she was forbidden entrance to the house by the elder Hoffman; and though, to the knowledge of both officers, she requested opportunity to speak with her client, she was denied that privilege until after the confession had been signed. Held by these officers in a room to which no friend of the defendant's was admitted, he was subjected to four hours of rigorous and determined interrogation. Over and over again he denied all complicity in the alleged crime, only to have his statements rejected as false, and met with the insistent demand upon him to confess. True, the officers say they did not, in so many words, demand a "confession," but that they were simply demanding that he tell the truth. This, however, is only a play upon words; for his assertion of what he claimed to be the truth was met by constant repetition of a demand which implied that he was telling a falsehood, and that no answer would be satisfactory which did not admit his guilt. The inquisition was continued without cessation for the noon meal or any opportunity given for rest or counsel with friends. He was dressed in the clothing he had given the officers on the day before; a veil or scarf was thrown over his face; and the complaining witness was called in, to identify him. One Pfohl, who appears as a sort of generalissimo of the outside crowd, was admitted to the room, and took part in the examination, saying to the defendant, when the latter denied his guilt, "We have got the goods on you, and it will be better for you to tell the truth about it;" and, to emphasize the effect of his words, the same individual declared that he had himself seen Jimmie cut the telephone wire on the morning of the assault, and then go toward the Hoffman house,—a

statement which was confessedly false. In this same connection, the sheriff testifies that Pfohl said to defendant:

"Now they got the goods on you, young fellow,—you might just as well tell the truth, and get this whole matter settled up. We might make a settlement of some kind. Tell the truth, and get the matter settled up."

True, Pfohl was not an officer; but he was there with the consent of the sheriff and the county attorney, assisting them in securing the confession; and defendant was justified in assuming that he spoke with their authority. Soon after this, defendant's nerve gave way, and he suggested a settlement, to which his attention had evidently been directed by the language of Pfohl; and upon the refusal of his overture, he answered the sheriff's question, "Did you do this or did you not?" by saying, "I did not do it, but I will say I did." But after the officers' refusal to accept this answer, it is alleged that he said, "I did it." The writing was then prepared by the county attorney, and signed by the defendant. The spirit and manner of this prolonged inquisition are reflected in the sheriff's statement as a witness:

"For three hours he had been denying the whole business. We went into other details. We were accusing him, not only of raping this woman, but of other crimes,—running other women around. * * * For three hours he maintained his innocence, in spite of me and the county attorney. * * * We didn't pretend to put anything in the confession except that part of what the boy said that I thought was against him. We didn't want to convict him unless he was guilty, and I thought we gave him a fair deal. I figured he was lying, all that he said up to the time he made the confession."

Defendant knew that the men assuming to conduct the examination were the sheriff and county attorney, and he evidently supposed that they were within their legal rights in so doing. They did not give him any instruction or warning as to his own rights in the premises, or tell him that whatever he might say would be used against him on a trial, and refused, as we have seen, to permit him to be represented by counsel or friend. They repeatedly impressed upon him their belief that

he was lying, and insisted that he "tell the truth," but refused to accept as truth anything less than a confession. The defendant, as a witness, says that, in pressing him for a confession, the sheriff threatened to turn him over to the mob, which would hang or shoot him; but the officers deny this accusation. In other respects, the details of the proceedings at the Hoffman home, where the confession was obtained, are not in serious conflict. Of the effect upon defendant's mind, he says:

"Well, I broke down, and was scared to death, and thought I had to do just what they told me. I was afraid of the bunch of people outside. * * * It saved me from getting hung, anyhow. They said I had to do it, and I did it."

The attorney, Mrs. Utt, who was admitted to the room after the confession had been procured and the sheriff was preparing to take the accused to Dubuque, testifies that she found him crying, and that, when she asked if he did the act, he answered, "No, but they say I did it, and I will say so, but I didn't;" and that, when asked why he signed the paper, he replied, "They made me."

That the surroundings were such as to inspire fear, if not terror, in the defendant's mind is quite clear. He was charged with a crime the very accusation of which is sure to arouse public passion, and is liable to excite mob violence. He was isolated from his friends. He was denied the aid of counsel. He was in the house and hands of his enemies. Some 30 or 40 people surrounded or were within the immediate vicinity of the place. The sheriff himself says that the people were "pretty well riled up, and might do something." They were seen to be gathered in groups, showing more or less excitement; and the sheriff felt justified in getting away with his prisoner quietly, assuring Mrs. Utt that he would protect him from injury. Altogether, the situation was such as might well excite a high degree of fear and apprehension in the accused, whether guilty or not guilty.

It would be farcical to pretend that a confession so procured was voluntary, in any sense of the word. Probably the most frequently quoted statement of the rule is found in 3 Russell on Crimes (6th Ed.) 478, where the author says:

"A confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

Of the multitude of authorities upholding this rule, we may cite the following examples: In *People v. Brockett,* 195 Mich. 169 (161 N. W. 991), the Michigan court says:

"Proof of a confession is never admissible unless it is voluntarily made; and by the word 'voluntarily' is meant that the confession must be of the free will and accord of the defendant, without coercion, whether from fear of any threat of harm, promise, or inducement, by hope of reward or method known as 'sweating.' "

This language is used with reference to a case having many features like the one before us, and in ruling out the confession, the court says:

"In our opinion, the means used by the uncontradicted evidence in the instant case must have so agitated the mind of the defendant as to arouse his fear, and to have a coercive effect. Therefore the confession was not voluntary."

The rule has been restated by this court in no uncertain terms in *State v. Storms,* 113 Iowa 385, 391, as follows:

"If the confession is obtained by any sort of threats or violence, or by any direct or implied promises, however slight, or by the exertion of any improper influence, it is inadmissible. Inquisitorial proceedings which directly or indirectly menace the life or safety of the prisoner, and are calculated to produce such a state of mind as that the answers given to the questions propounded are not free and voluntary, will not be tolerated."

Applying the rule in a case where the officer having the accused in charge permitted third persons, somewhat after the manner of the man Pfohl in the instant case, to take part in the

examination, and to impress on the prisoner's mind that it would be better for him, or that he would get off easier, if he made confession, Justice Cooley says:

"None of these persons was the officer in charge; but their admission to the cell at such an unreasonable hour carried with it an implication of the officer's consent to their mission; and respondent could scarcely fail to be impressed that their assurances were made with full authority. No reliance can be placed upon admissions of guilt so obtained, for the very obvious reason that they are not made because they are true, but because, whether true or false, the accused is led to believe it is for his interest to make them." *People v. Wolcott,* 51 Mich. 612 (17 N. W. 78).

Quite in point, also, is *Commonwealth v. Nott,* 135 Mass. 269, where the accused was charged with theft, and when he was examined at the police station, a witness said to him:

"Now, Jim, you had better own up. I was in the place when you took it. We have got you down fine. This is not the first you have taken. We have got other things against you nearly as good as this."

A confession or admission thus induced was held inadmissible. The court there says that the words addressed to the accused were equivalent to saying, "You had better confess," and that the words which follow "imply that denial would be useless, because the defendant had been seen to do the act. Finally, there was an intimation that other criminal acts could be proved against him. These words were spoken before an arrest, to be sure, but by a police officer, in a police station, and in the presence of the officer in charge, who appears to have been the common superior of the speaker and of the defendant. They were not simply an admonition to tell the truth, but they held out an inducement to make a confession of guilt. The confession, therefore, should have been excluded."

In *People v. McMahon,* 15 N. Y. 384, it is said that the term "voluntary" is "not in all cases used in contradistinction to compulsory; because a confession obtained by either threats or promises from anyone having authority over the accused or concerned in the administration of justice is uniformly held to

be inadmissible. However slight the threat or small the inducement thus held out, the statement will be excluded as not voluntary. It is plain, therefore, that, in such cases at least, by 'voluntary' is meant, proceeding from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause. The principle upon which this rule is based is obvious. It is that we cannot safely judge of the relation between the motives and the declarations of the accused, when to the natural agitation consequent upon being charged with crime is superadded the disturbance produced by hopes or fears artificially excited.''

See, also, to same effect, *Commonwealth v. Knapp,* 9 Pick. (Mass.) 495; *Commonwealth v. Curtis,* 97 Mass. 574, 578.

''A confession induced by hope or fear, excited in the mind by the representations or threats of anyone, is not to be considered as voluntary.'' *Spears v. State,* 2 Ohio St. 583.

In *People v. Quan Gim Gow,* 23 Cal. App. 507 (138 Pac. 918), the defendant, a Chinaman, at a time when and in a jurisdiction where there is supposed to be no undue sympathy for persons of his class and kind, was on trial for murder, and an alleged confession was admitted in evidence against him. It was shown that the confession was obtained as follows (we quote from the opinion):

''Was the statement of the defendant shown to have been voluntarily made? If not, then no evidence of it was entitled to have been given to the jury. The defendant, a Chinaman, was brought, while under arrest, alone, and unaccompanied by friends or counsel, into the office of the detectives, and there subjected to a vigorous oral examination. At first he refused to answer any questions, and his silence continued for from five to ten minutes. The questions were persisted in; the same interrogatory designed to draw from him the admission that he fired the shot that killed Chin Hoy Hing was repeated many times. At one point, he said he did not 'savey,' or understand: He fidgeted and squirmed in his chair, and appeared afraid of something. Finally he gave the statement set forth in the foregoing. * * * While no physical force was used, and neither threats nor promises made, there can be no doubt at all but that

the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution to remain silent. Admittedly, his refusal at first to answer incriminating questions gave evidence of a desire to make no statement. When did this unwillingness vanish, and a desire to talk succeed it? Not after he had been given any period of time for reflection; for his inquisitors allowed him none. The examination was persisted in until a response was forthcoming; and under these circumstances it must be said the responses appear to have been unwillingly made, and as a direct result of continued importuning.''

The testimony of the sheriff and the county attorney in the instant case, with respect to the four hours' grilling administered by them to the defendant and the manner in which the written statement was obtained (assuming it to be literally true), makes a showing of an extorted, unwilling, and involuntary confession, by comparison with which the practices condemned in Quan Gim Gow's case are mild in the extreme.

Another precedent to the same point from the same court is *People v. Borello*, 161 Cal. 367 (119 Pac. 500). There, after a day or two of preliminary inquiry, the sheriff and prosecuting attorney put the defendant through an interview in which, after several hours of inquisition, they obtained the alleged confession. The methods employed are described by the court as ''a species of deception, employed to embarrass, disconcert, and entrap the defendant.'' In speaking of the officer's testimony to the effect that, when the prisoner denied his guilt and showed an unwillingness to admit what they were trying to extract from him, ''they just kept on'' asking the questions, the court further says:

''But it is these very questions, put by the sheriff and district attorney, the continuous and searching examination to which the defendant was put by both of them, in an endeavor to wring out a confession, when it was apparent that he was not disposed to make one, and their statements and conduct toward him, which showed that the confession was not freely and voluntarily made.''

See, also, *People v. Phillips*, 42 N. Y. 200; *Bubster v. State*,

33 Neb. 663 (50 N. W. 953); *Johnson v. State,* 107 Miss. 196 (65 So. 218); *Pinckard v. State,* 62 Tex. Cr. Rep. 602 (138 S. W. 601); *Lester v. State,* 170 Ala. 36; *People v. Prestidge,* 182 Mich. 80 (148 N. W. 347).

Further citations at this point are unnecessary. While courts have not always been consistent in their observance of the rule, the divergence in the precedents has arisen more upon its application to varying states of fact than upon the soundness of the principle involved.

Before leaving this feature of the case, we think it not improper to say that, while diligence and zeal in public prosecutors and officers of the law to ferret out crime and punish offenders are highly commendable qualities, there is in too many cases a regrettable tendency to exercise their authority without due regard to the rights which pertain to every citizen until he has forfeited them by conviction of crime. If a crime has been committed, an officer of the law may properly apprehend and restrain of his liberty any person charged therewith for whose arrest he holds a warrant, and even without warrant he may arrest one who commits a public offense in his presence. And if a public offense has been in fact committed by someone, and the officer has reasonable ground for believing that any given person is guilty of it, he may properly arrest such person without warrant. An arrest being lawfully made, it becomes the duty of the officer to promptly produce his prisoner to the proper magistrate, to be dealt with according to law. Code, Title XXV, Chapters 10 and 11. But it is not within the province of the public prosecutor or sheriff or policeman or detective or of all of them together to assume the guilt of a person not under arrest, for whose apprehension they hold no writ, and restrain him of his liberty or subject him to the indignity of inquisitorial examination, and grill him by methods which pertain to that modern instrument of torture known as the "sweat box." The mere fact that those who assume such authority and engage in such practices are public officers does not exonerate them from the charge of violating the law of which they are the sworn defenders, or differentiate them in any legal sense from the mob. If the sheriff and county attorney in this case had reasonable

ground to believe defendant was guilty of the crime charged, it was, as we have already indicated, within the scope of their duty and authority to arrest him and produce him before the magistrate, where an examination could be had in an orderly and lawful way, and the rights of the State on the one hand and of the accused on the other could be properly protected. Instead of this, they constituted themselves a tribunal unknown to the law, and proceeded without warrant to subject the man to a secret examination, from which his friends and his counsel were carefully excluded. They *assumed* his guilt, and refused to credit his denials and his protestations of innocence or to accept anything he might say in his own behalf until they had extorted from him the alleged confession. Such proceedings are without excuse or justification; and to tolerate them or to ignore them without rebuke is to bring reproach upon the law and to convert the administration of justice into an engine for the perpetration of rank injustice.

II. The trial court adopted the theory that the question whether the alleged confession was freely and voluntarily made was for the jury; and in its charge told the jury that, unless they found that such confession had been freely and voluntarily made, it should be rejected, and given no weight against the defendant. It is the contention of appellant that, while this statement of the legal effect of a confession is substantially correct, the court erred in submitting the question of its voluntary character to the jury. There is some confusion in the authorities upon this proposition; but it is settled in this state that, where the free and voluntary character of the statements relied upon as a confession is the subject of dispute or conflict in the evidence, the question may properly be submitted to the jury. *State v. Storms*, supra; *State v. Bennett*, 143 Iowa 214. If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evidence, it is the duty of the court to sustain the objection and refuse its submission to the jury. *State v. Chambers*, 39 Iowa 179; *State v. Jay*, 116 Iowa 264.

Observing these rules, if the question of the voluntary char-

acter of this confession were made to turn upon the truth of the dispute between the defendant and the sheriff as to the alleged threat by the officer to turn his prisoner over to the mob, the instruction given by the trial court would involve no error. But the question presented by the record is not so narrow as this. The defendant's story as to the officer's threat may be rejected entirely, or the truth of that particular item of dispute may be conceded to be with the sheriff; and yet enough remains of the facts conceded by the latter and by the county attorney and by the undisputed testimony of others, relating to the circumstances already mentioned in connection with the matter and manner of obtaining the confession, to compel the conclusion that it was not freely or voluntarily made; and in our opinion the court should have so ruled.

Other exceptions to the charge to the jury have been argued by the appellant; but in view of our holding on other matters which necessitate a reversal, we will not extend this opinion for their discussion.

III. Of the objection to the sufficiency of the evidence, it must be said that it is well taken. This is assuredly true if we are correct in holding that the court erred in submitting the confession to the jury. We may add, however, that the State's case presents some unusual and unsatisfying features. Without in any manner questioning the character of the complaining witness, whose womanly virtue is not denied or assailed by the defense, it must be said that her identification of the appellant as the man who assaulted her is too vague and uncertain to establish that fact beyond a reasonable doubt. Though appellant was one of her nearest neighbors, a man with whom she was familiarly acquainted, and though she saw her assailant approach the house, heard his voice, and engaged in a struggle with him, she observed nothing in him to suggest the idea that he was Jimmie Thomas, and it was only after the crime had been accomplished and he had left the house that she says:

"The minute he left the house, it came to my mind it was Jimmie Thomas; but I didn't know it while the attack was going on."

Her revelation of that thought to her husband, she says

was in the following words, "You don't need to say anything about it, but I *think* this was Jimmie Thomas." Her husband's version of her statement to him is as follows:

"Well, these are the very words she told me. She said, 'I don't care. It *seems to my mind* that it was Jimmie Thomas.'"

That this was not the language of certainty is very obvious. Having a direct bearing on the value of her identification of her assailant is the strange story she tells of her own action at the time. Having just been made the victim of an almost inconceivably brutal rape, and having, according to her story, satisfied her own mind that her assailant was Jimmie Thomas, she went directly to the house of the criminal, told her story of being attacked by a stranger, sent Jimmie down to her house to ascertain if the stranger were still there, and then, on Jimmie's return, she took a seat with him in his car, and, going to her home, requested him to enter the house and remain with her alone until her husband's return, an hour later. There are other circumstances which we will not stop to mention which add to the apparent unreality of her present belief of the defendant's guilt, and deepen the mystery which surrounds this affair. Conceding the woman's good faith, and assuming, as we must, her womanly instincts and sensibilities, which would naturally make it impossible for her to consent to breathe the same air with the inhuman monster who had just heaped upon her the foulest of all wrongs, the only apparent explanation of her story would seem to be that her identification of the defendant as her assailant is not so much a matter of her memory of that trying hour as it is the product or growth of a later formed suspicion.

There is another feature of the case which may well justify a pause and hesitation before sustaining a conviction on such showing. The charge made in the indictment is rape; and if the case made by the State is to be accepted, the crime committed was not only a fully accomplished rape, but one of such surpassing wickedness that an average American jury, convinced of the truth of the charge, would have not the slightest hesitation in returning a verdict of guilty thereof; and yet we find the jury in this case convicting this defendant, not of rape, but

of assault with intent to commit rape. This alone would not justify this court in reversing a conviction; but where the case is obscured by an atmosphere of doubt, it is a circumstance entitled to consideration. *State v. Pilkington*, 92 Iowa 92. We do not overlook the general rule that the finding of a jury upon an issue of fact is ordinarily to be accepted as final; but the rule is one of less imperative force in a criminal than in a civil case, and a verdict of guilty will not be allowed to stand if it be manifestly against the clear weight of the evidence. *State v. Wise*, 83 Iowa 596; *State v. Pilkington*, supra; *State v. White*, 98 Iowa 346.

One of the essential facts to sustain a conviction in a criminal case is the identification of the accused as the offender; and this must be shown beyond a reasonable doubt. Such a showing is not to be found in this record, and the verdict cannot be permitted to stand.

For the reasons already stated, the judgment appealed from is reversed, and the cause will be remanded for further proceedings not inconsistent with the views expressed in this opinion.— *Reversed and remanded.*

STEVENS, C. J., EVANS, FAVILLE, and DE GRAFF, JJ., concur.