[Crim. No. 4389. In Bank. Apr. 29, 1942.]

THE PEOPLE, Respondent, v. ISAAC WILLIAMS et al.,
Appellants.

A. P. Coviello and E. A. Mosk for Appellants.

Earl Warren, Attorney General, and Frank Richards and Gilbert F. Nelson, Deputies Attorney General, for Respondent.

EDMONDS, J.—In accordance with the provisions of section 1239, subdivision (b), of the Penal Code, the judgments by which T. 'J. Elie, also known as Roland Helaire, and Isaac Williams were convicted of the crime of murder in the first degree and sentenced to death are before the court for review.

These appellants and two women, Cordie Mae Jackson and Lillian Miller, were charged with the killing of Sokotare Okita, a Japanese who conducted a small restaurant and bar known as the Williams Cafe, on lower Fifth Street in Los Angeles. Williams was also charged with the prior conviction of a felony, which he denied. Upon trial by the court,

sitting without a jury, the women were found not guilty. Elie, who had entered the additional plea of not guilty by reason of insanity, was then tried upon that issue and found sane.

On the morning of April 18th, when Ruth Lucero, a waitress, came to work, she found the restaurant door locked. After there was no response to her knock, she called the police department. Two officers, assigned to investigate, broke in the door and found the dead body of Okita lying on the bed in a small room where he slept on the premises. His purse was missing and the cash register was empty. According to the autopsy report, "The cause of death was concussion of the brain . . . there were multiple abrasions and contusions about the face and forehead . . . the skull is unusually thick and hard. It is not broken. . . ."

Elie and Williams have apparently spent many evenings on East Fifth Street. They were well known to Officers Bain and Kopytek, who worked that police beat. Lillian Miller visited the cafe sometimes once or twice a week. She, Elie and Williams are negroes. Cordie Mae Jackson, who is the fourth person charged with the crime, worked as Okita's barkeeper. She is a white woman.

The testimony of Officer Bain indicates the kind of a place Okita conducted. He said: "I very seldom saw the old fellow (Okita) when he was not bandaged. . . . He was beat up all the time." These injuries, Bain explained, were received in many fights and brawls that went on around there.

The two officers passed the Williams Cafe at intervals of about two hours. On the night of April 17th, Bain testified, he saw all four of the defendants. Elie was the first one he encountered. At that time, about nine o'clock, Elie was on Fifth Street with Henry Williams, another negro. Lillian Miller was seated at the bar in Okita's Cafe; Cordie Mae Jackson was behind the bar, and Okita, known as "Pop," was farther back. At that time Okita wore a bandage around his head which covered his left eye. After looking in at the cafe, the officers walked west and continued their rounds. Later that night, probably about eleven o'clock, Bain saw Isaac Williams on East Fifth Street and talked with him. He also saw Elie about the same time, still with Henry Williams.

The testimony of Officer Kopytek, Bain's companion, placed Elie, Isaac Williams, Lillian Miller and Cordie Mae Jackson in the Williams Cafe at the time of their nine o'clock round. Cordie Mae Jackson was behind the bar and she and the

three others "were all talking together." The officer stated that he saw Elie on the street later that night.

Aside from this testimony, the only evidence which placed the appellants and their companions at Okita's Cafe on the night of the crime came from Alfred Watson. As a witness for the prosecution, he stated that at 2:30 o'clock on the morning of April 18th, he was standing on East Fifth Street, three-quarters of a block from Okita's place of business. There were no lights in the cafe. At that time, he said, Elie, Isaac Williams, Lillian Miller and Cordie Mae Jackson came out of the cafe and went west on Fifth Street.

This witness admitted that he did not know any of the four defendants by name, but that he had seen them all "up and down the street." As they came out of the cafe, he said, he looked at them "long enough to kind of see who they was" and then went home.

In summing up the evidence which had been presented, the trial judge characterized the testimony of Watson as unworthy of belief. "This unfortunate negro," he said, "has either told the court the truth or else is a confirmed perjurer, whose ulterior motive in testifying as he has is unknown to the court. Now, in analyzing his testimony the court wonders how he can be so positive under the lighting conditions that he experienced, and his short acquaintance with the girls involved, so as to enable him to state positively that those are the girls who were there. Aside from this meager identification, he has been impeached on many other points, all of which the court must take into consideration in weighing the value of his testimony." Because of the insufficiency of the evidence, the court concluded, the girls would be acquitted.

As Watson saw all four of the defendants from the same place and under the same circumstances, the trial judge undoubtedly considered his testimony to be equally unreliable as to Elie and Isaac Williams. But Elie not only made several statements to the police, in each of which he stated that he hid in the cafe for the purpose of robbing Okita and fought with the Japanese when discovered, but he admitted those acts as a witness upon his own behalf. As to Isaac Williams, the prosecution relied upon asserted confessions he made to police officers. Williams, however, not only testified that he never made such confessions but he told of a course of mistreatment at the hands of the officers of the Los Angeles Police Department which, unfortunately, is strikingly similar

to the complaints of other defendants as related in court at too frequent intervals. Moreover, he positively stated that he did not agree to participate in the robbery of Okita and was not present when the crime was committed.

Edward J. Romero, one of the investigating officers, testified that in the afternoon of April 18th, he questioned Cordie Mae Jackson at the police station. According to him, she said that Elie, Isaac Williams and Lillian Miller were at the cafe when it closed shortly after midnight, and that when he asked her if she knew of anyone who could have killed Okita she first said she did not. "How about Elie and how about Ike?," he then inquired, he said, and she replied: "Well, get them and you might get the right ones." Lillian Miller was then found on Fifth Street and questioned, but both women were released.

Elie was arrested the next morning at his work and taken to the Detective Bureau in the City Hall. According to the record, he was questioned by police officers on that day and the two succeeding ones. Romero, as the principal witness for the prosecution, testifying concerning what he termed the "first conversation," quoted Elie as telling a story which included him and his codefendants as participants in the crime. This confession, said Romero, commenced with the plan which they made to commit the robbery and continued with the account of Elie's lying in wait until the Jap owner was asleep, the entrance of Williams and the two women, the brutal slaying of the victim with a hatchet, the placing of a woman's coat to throw suspicion elsewhere, and finally, their departure, together.

The escape, as related by Elie, said Romero in his further testimony, was made as follows: ". . . it was around three o'clock in the morning when they left there; that they went outside and got into Lily Miller's car; that they drove from there east on Fifth Street and they finally went up on Kohler Street near a gypsy place and he stated that Williams threw the hatchet in this gypsy's yard; that after that they drove him on home over on Morgan Avenue. The next day he went to work, . . . and that Henry Williams came over to . . . where he was working, and that Henry Williams and he got in a car; while they were driving by 20th and Maple Avenue that he threw the . . . tobacco pouch used as a money bag by Okita into a culvert." Romero said that the pouch was found in the place described by Elie.

But after giving this stirring recital of the crime, Romero

said, "No, this was not the first conversation." He then referred to a typewritten statement which he said was the transcript of a confession taken from Elie the morning he was arrested. A stenographer was present at that time, said Romero. In this account of the crime, Elie said that he and Isaac Williams planned to rob Okita but that he, Elie, hid in the cafe and, after some time came out of his hiding place to get the money. "The cat knocked a bottle down off the sink . . . Papa got up to see what made the noise. . . . He had a hatchet in his hand. . . . He hit at me with the hatchet and I pushed him back on the bed. We had a little scuffle. I took the hatchet away and struck him with it . . . five times. . . . He was out and I just took his change, about $15 or something in the billfold he had."

Elie's explanation of why Williams was not with him when the crime was committed is shown by these questions and his answers to them:

"Q: How did it happen you pulled it by yourself? "A: There was no chance for me and him to get in the back together so I got a chance to get in the back myself so I stayed until they closed. "Q: Did Ike know you were back there? "A: I do not think he does. "Q: You have not seen him since? "A: No."

But, in later testimony, Romero was not certain that a stenographer had reported this conversation and he also referred to another "first conversation" between him and Elie in which Elie, when charged with the murder, stated that neither Henry Williams, Ike Williams nor the two women had anything to do with it. "I did it myself," Romero quoted Elie as saying. In giving the details of the crime, Romero testified, Elie said "that he went into the cafe by himself and hid out, and after Okita had closed the place an hour or so . . . that he waited back there in the dark . . . he started to go to the room, and the cat . . . made some noise. He says that woke up the Jap; that the Jap opened the door with a hatchet in his hand; that he struck the Jap and took the hatchet away from him and struck the Japanese with the hatchet over the. head; that afterwards he took the money out of the Japanese's pocket and that he left, and that he was by himself."

In connection with these conversations, Romero said that Lillian Miller and Cordie Mae Jackson were brought into the Detective Bureau during the questioning of Elie on the third

day, and each of them stated that Elie's statements concerning them were untrue.

Isaac Williams was arrested on April 20th and questioned by the police officers at the City Hall that evening. Romero produced an unsigned typewritten statement which he said was the record of a confession taken from Williams at that time by means of questions asked by Captain Edwards in the presence of himself and Kyako Kay Komai and Elfreda Stein, two stenographers employed by the Police Department.

According to this statement, the appellant Williams with Henry Williams and Elie, who is referred to as T. J., discussed the proposed robbery of Okita. Henry Williams declined to participate in it and left the others. Isaac Williams went to a place next door but returned to the Okita cafe about midnight. By that time Elie had hidden in the back room. Continuing the confession, according to the transcript, Isaac Williams said that he, Lillian Miller and Cordie Mae Jackson left the cafe when Okita closed it, but returned in an hour. All three of them then entered by using Cordie Mae Jackson's key.

"Lillian and myself goes clean to the back," the statement quotes Williams as saying. Cordie Mae stops at the kitchen . . . T. J. tells me, motions to me there he is. Before he said that I done look inside the door. I seen Jap Papa sitting knees down in the bed . . . T. J. pushed an ax over to one side with his foot. My statement was in asking had he killed the old man . . . He said yes . . . I was being scared. I started to run . . . Cordie Mae was trying to get the money from the bucket in the kitchen . . . We all goes out . . . and gets in the car. We drove away. When we got to Seventh Street I asked about my part of the money. Lillian said, 'You wait, you got plenty of time, you are in a hurry for your money.' "

Although Romero testified that this statement was given under no promise of reward or immunity and that no force or violence was used in obtaining it, Williams told a graphic story of mistreatment by the officers. He said that he was arrested by two officers, one of whom said, " 'I wants to know about killing that Jap?' . . . I said, I ain't killed no Jap. About that time I happened to look around and the other one hauled off and hit me." Continuing his testimony, Williams said he still had "the place" where he was struck. He was then taken to the City Hall and turned over to Officer Meza, who in turn turned him over to Captain Edwards. Another officer was present at the time.

When he refused to admit that he killed Okita, said Williams, Captain Edwards "hauled off kicking me in my stomach." Later, Detective Barnes "hit me with his fist in the mouth as hard as he could . . . Then an officer came over and stomped on me, kicked me with both feet. . . ."

At that time, Williams testified, he said: "Do you think that is going to make me tell a story on myself?" Detective Barnes replied, "Well, we have a man you will tell your story to and that is the big bad wolf." Captain Edwards telephoned and in a few minutes Romero appeared. At that time, Williams said, he was handcuffed to a chair. When Romero came, he told him, "Every time you say no, you didn't kill any Jap, I am going to hit you three licks."

Then Detective Barnes used a billy on him, Williams told the court, until the blood came. "Another tall policeman came in . . . and . . . walks over and gets two napkins and said 'Wipe off your face.' " And as he reached for the napkins, said Williams, this policeman hit him in the face. "They whipped me pitifully; pretty near done kill me, but I still tell them nothing . . . So they had me, beat me, they all beat me good, and there was blood all over my coat just like it is now." Showing his coat to the trial judge, Williams said, ". . . that is blood; and here is some more blood right here on my trousers, down there. I ain't got the shirt, because they tore my shirt clean off."

The record shows some corroboration of this testimony. Romero reluctantly admitted that when Williams was questioned, "he had a small cut inside of his lip," but he denied that blood was coming from it. Of even more significance is the testimony of a clerk who was acquainted with Williams. He stated that he saw Williams at the Okita cafe during the investigation of the murder. Williams was then in the custody of Officers Romero and Meza. He had one eye "almost completely closed," said this witness; the other one was "very much closed," and his mouth was swollen.

Of considerable importance in this connection is Romero's testimony concerning the officers who were present at the time Williams was being questioned in the Detective Bureau. In denying that Officer Slager was there he said, "I didn't see Slager that night at all." He was then asked, "Isn't it true . . . [that] when Officer Slager came into the room there and saw Isaac Williams in your custody . . . he walked up to Isaac Williams and he told you, . . . 'Why, I know that eight ball' and he hit Isaac Williams in the mouth with his right fist?"

Romero replied: "I was answering the telephone when I heard one word spoken as 'eight ball' and that is all. No one struck anybody. Somebody said something about 'eight ball' and there was no one near him at any time." But when confronted with the transcript of his testimony given at the preliminary examination, Romero admitted that he had then answered a question as to whether Slager was present during the questioning of Williams by saying: "Yes, sir, he came in there and noticed Ike Williams. He says, 'I know that eight ball' and walked out again."

Romero's testimony was likewise contradictory as to Officer Meza. At the trial Romero stated positively that Meza was not present at any time while he had Isaac Williams in custody. But it appears that at the preliminary examination he stated to the contrary and said Meza was with him for from one to one and one-half hours.

The testimony of Williams included a story of extraordinary circumstances surrounding the taking of his statement. After the officers stopped beating him, he said, Kyako Kay Komai, the Japanese, "and a white woman came out, and the white woman had a typewriter there and the Jap woman had a paper, and she sits at the table, and the white woman sits here by the typewriter and . . . then Captain Edwards said, 'I am going to read something here.' He read something about that long [indicating] to her. After he read it the Jap woman here didn't say nothing. So Romero had a piece of paper about that long [indicating], with a lot of stuff all wrote down—I didn't tell him to put in on there—so the Jap woman couldn't write the stuff, and the white woman said she couldn't write the stuff. The white woman told him to let her practice by writing it on the typewriter. He said, 'No, I will give you this, and you can type it out before you go to bed.' I didn't see the white woman and I didn't see the Jap woman do anything. That was all that was said."

Romero's version of what took place shows an utter indifference to the rights of a prisoner being examined by police officers, if not more. He was asked if Elfreda Stein took down any notes of the confession. His answer was, "Yes, I believe she did." Continuing, he said that Mrs. Stein was "trying to type—see how fast she could take on the typewriter while the other girl took down the actual statement . . . She started to and then quit and she listened in on the conversation." In answer to the question, "You say she started to type something down while you were questioning Ike Williams?," Romero ex-

plained: "She was taking down the actual questions and answers as far as she could go, and then she quit and listened in. In other words, she was trying to practice in taking statements while the other girl actually took the statement in shorthand."

Kyako Kay Komai, the "other girl," when called to identify the statement, said that she was called in to take the questioning of Williams by Captain Edwards. Romero and Mrs. Stein were also there. She also stated that she had her shorthand notes of the questions asked and the answers given to them at that time. But when she was asked whether she had transcribed those notes, she said that Mrs. Stein had written the confession from notes made by the latter.

■ Following his conviction, Elie was tried upon his plea of not guilty by reason of insanity, and he now contends that the decision that he was sane at the time of the commission of the crime "was against the evidence."

In support of his plea, Elie proved that in 1937 he disappeared from his home in Louisiana and, when located, was sent to an insane asylum, from which he escaped. Witnesses testified to acts tending to show that he had been irrational at subsequent times. But three alienists, appointed by the court, testified that he was sane and they based their opinions upon examinations of and conversations with him. From the record, it is apparent that Elie is a negro of low mentality, but there is abundant evidence to support the trial judge's determination that he was sane when Okita met his death.

■ Elie and Williams each moved the court for a new trial upon the ground that newly discovered evidence which could be presented by the testimony of physicians would show Okita's death was not caused by the blow of a hatchet. No affidavits in support of the motion were filed, although counsel stated the evidence he believed he could produce. But as Elie stated on the witness stand, as well as in the confessions which were presented in evidence by the officers, that he lay in wait to rob Okita, the amount of brutality used by him, or Isaac Williams, if in fact Williams was with him, would not affect the degree of the crime although it would undoubtedly be taken into consideration by the trial judge in fixing the sentence. Under the record presented, however, the court did not err in denying the motion for a new trial upon this ground.

■ As grounds for reversal of the judgment, Elie contends that the evidence is insufficient to support it and that his confessions to the officers and as a witness in his own behalf

are so confused there is an absence of necessary proof to find him guilty of murder in the first degree. He places special emphasis upon the fact that, prior to the night of his death, Okita had engaged in numerous fights and brawls and, because of injuries resulting from them, was in such physical condition that almost any type of blow or even an accidental fall could have caused his death.

But this is a criticism of the evidence upon the basis of credibility. Although Elie's various stories of the crime varied in some details, he admitted in each of his statements to the officers, and also upon the witness stand, that he concealed himself in the cafe for the purpose of robbing Okita and that he carried out that purpose. It is true that in one version of the crime, he related facts tending to show a killing which was either unintentional or accidental, but as it was committed in the perpetration of a robbery, the offense is murder of the first degree. (*People* v. *Cook*, 15 Cal. (2d) 507 [102 P. (2d) 752] ; *People* v. *Perry*, 14 Cal. (2d) 387 [94 P. (2d) 559, 124 A. L. R. 1123] ; *People* v. *Arnold*, 199 Cal. 471 [250 Pac. 168].)

The appellant also complains of the ruling of the court upon the motion of Cordie Mae Jackson and Lillian Miller for their discharge under the provisions of section 1100 of the Penal Code, reading as follows: ''When two or more persons are included in the same indictment or information, and the court is of opinion that in regard to a particular defendant there is not sufficient evidence to put him on his defense, it must order him to be discharged before the evidence is closed, that he may be a witness for his co-defendant.'' The appellant contends that as there was no evidence offered after this motion was made tending to connect the two women with the commission of the crime, and the trial judge acquitted them upon the ground that the evidence was insufficient to establish their guilt, that the ruling constitutes prejudicial error. In support of the court's ruling, the attorney general calls attention to evidence offered by Cordie Mae Jackson and Lillian Miller in their defense, to the effect that they left the cafe shortly after twelve o'clock of April 17th and drove to Lillian Miller's home, where Cordie Mae Jackson left them. This evidence also showed that they were not at the cafe at any time later that night.

As has been stated, the trial judge acquitted the two women upon the ground that there was no evidence tending to connect them with the commission of the crime except that

of the witness Alfred Watson, which he stated was unworthy of belief, and the record indicates that the testimony offered in defense was not considered. But in view of Elie's consistent statements that he hid in the cafe for the purpose of robbery and struck Okita down when discovered, and also because he did not state what the women's testimony would have been, there was no error in the court's ruling.

The appeal of Isaac Williams presents three principal questions for decision. The first of these is whether there is sufficient evidence to sustain the judgment against him. The second question also relates to the evidence, for he contends that the court committed prejudicial error in admitting the testimony concerning his confessions. He also argues that he was prejudiced by the ruling of the court in denying the motion to dismiss the charges against the two women.

The attorney general concedes that unless the testimony of Alfred Watson can be considered as against Williams when it was not worthy of belief as against the two women who were jointly charged with him, then there is no evidence whatever establishing his guilt except the testimony of Officer Romero that he had confessed to the crime. And although Romero denied categorically that he had used any force or violence upon Williams while he was in custody, Williams testified that during the questioning Captain Edwards hauled off and kicked him in the stomach, Detective Barnes hit him in the mouth and a tall policeman, who inferentially was Officer Slager, after offering to give him a napkin with which to wipe his face, struck him. Moreover, Romero's contradictions and uncertainties cast grave doubt upon the truthfulness of his testimony. His admission that Williams had a cut on his lip should not pass unnoticed, and from the testimony of the citizen as to Williams' physical condition, it is difficult to believe that the police officers' conduct was what it should have been.

But if, considering all of the evidence, the trial judge was privileged to determine that Romero told the truth concerning his treatment of Williams and what occurred during the times he was present at the questioning, the testimony of Williams to the effect that Captain Edwards, Detective Barnes and the tall policeman mistreated him stands undisputed in the record. Neither one of these policemen was called upon to testify although each was charged with the most reprehensible conduct of which an officer may be guilty.

The mistreatment by police officers of a person arrested and charged with crime cannot be justified under any circumstances, and not only brings discredit upon the department of which they are members but also breeds widespread disrespect for the administration of justice. It certainly has no place in a democracy.

There is other evidence concerning the taking of Williams' statement which is most astounding. This comes from Romero and concerns the work of the stenographers who were present to report the conversation. It would be expected that in an investigation of a murder by officers of a metropolitan police department, the accused would at least have the benefit of a competent stenographer to record his conversation at that time. But Romero admits that one of the stenographers "was trying to practice in taking statements." And he and the other stenographer directly contradicted each other in identifying the typewritten statement of what purported to be the confession of a murder made by one who was under arrest and in the custody of police officers.

The voluntary confession of one accused of crime is properly admissible against him. But any physical mistreatment of the accused destroys the voluntary nature of such a statement and renders it worthless in a court of justice. Courts should be no less vigilant in protecting an accused from the effect of a statement extorted by the means of force than in upholding the use of a confession made freely and voluntarily. And the guilty as well as the innocent are entitled to the protection of officers of the law and to a fair trial.

Williams, who is shown by the record as a colored man of little education, was brought to the Detective Bureau in the City Hall and handcuffed to a chair. With no one to assist or counsel him, he was at the mercy of these policemen. They may not have mistreated him to the extent that he claims, but the prosecution failed to prove either that the typewritten statement purporting to be his confession was the record of his conversation or that his admissions were voluntarily made. The court therefore committed prejudicial error in admitting the testimony concerning his asserted conversation at that time.

The principles concerning the use of confessions have been followed in many cases. (*People* v. *Borello,* 161 Cal. 367 [119 Pac. 500, 37 L. R. A. (N.S.) 434]; *People* v. *Loper,* 159 Cal. 6 [112 Pac. 720, Ann. Cas. 1912B, 1193]; *People* v.

*Wilson,* 61 Cal. App. 611 [215 Pac. 565]; *People* v. *Quan Gim Gow,* 23 Cal. App. 507 [138 Pac. 918].) But one sentence used by the Supreme Court of the United States succinctly states the rule of decision which is applicable to this case insofar as Williams is concerned. It said: "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death." (*White* v. *Texas,* 310 U. S. 530, 533 [60 S. Ct. 1032, 84 L. Ed. 1342]. See, also, *Chambers* v. *Forida,* 309 U. S. 227 [60 S. Ct. 472, 84 L. Ed. 716]; *Brown* v. *Mississippi,* 297 U. S. 278 [56 S. Ct. 461, 80 L. Ed. 682].)

The judgment as to the appellant Elie and the order denying him a new trial is affirmed; because of the insufficiency of the evidence the judgment against the appellant Williams is reversed and the cause as to him remanded for new trial.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Traynor, J., concurred.

Reporter's Note: On May 12, 1942, the judgment was modified to read as above.