[Crim. No. 5054. In Bank. Apr. 28, 1950.]

THE PEOPLE, Respondent, v. LEANDRESS RILEY,
Appellant.

Rupert G. Crittenden, under appointment by the Supreme Court, for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SPENCE, J. — Defendant was charged in separate counts with (1) robbery and (2) murder. He pleaded not guilty and not guilty by reason of insanity to each count. After trial, the jury returned verdicts of guilty on both counts. As to the second count, the jury found the crime to be murder in the first degree and fixed the penalty at death. Defendant was then tried before the same jury on the issue of sanity and was found sane. A motion for a new trial was made and denied. This is an automatic appeal from the judgment imposing the death penalty and from the order denying a motion for a new trial in relation to that count. (Pen. Code, § 1239(b).)

Defendant does not question the sufficiency of the evidence to sustain his conviction of murder in the first degree, but he contends that certain alleged prejudicial errors deprived him of a fair trial. His arguments for reversal center on these principal points: (1) the impropriety of interrogatories and statements on the part of the trial court in that they had the effect of restricting the jury's exercise of discretion in fixing the penalty on a finding of murder in the first degree; (2) misconduct by the district attorney in his argument in that he transgressed the scope of the record, and the failure of the trial court to admonish the jury to disregard such remarks; and (3) the omission of a cautionary instruction for guidance of the jury in its consideration of the evidence

as to defendant's extrajudicial oral admissions. Careful examination of the record in the light of applicable rules of law clearly demonstrates that defendant's claims of prejudicial error are without merit, and accordingly the judgment of conviction imposing the death penalty must be affirmed.

With the exception of the varying versions of the precise manner in which defendant killed the deceased, the record reveals no conflict in the evidence which established the essential facts. On July 18, 1949, a few minutes past 8 o'clock in the morning, defendant entered Bedell's Restaurant in Sacramento, through the rear entrance off the alley, walked down a narrow corridor and knocked on the door of an office wherein Mrs. Gladys Phay and Mrs. Dorothy Paolini, employees of the restaurant, were counting the previous day's receipts. When the door was opened by Mrs. Phay, defendant pointed a pistol at her and stated, "This is a stick-up." He brushed by Mrs. Phay to Mrs. Paolini's desk, "scooped up" all the currency lying thereon, $926, and a check for $56.66, and then started to leave. Defendant seemed to be nervous and excited in his actions, according to these witnesses. The office had a glass front and sides, so that what transpired therein could be seen by anyone in the outside corridor, and likewise the latter passage would be visible to the occupants of the office.

In the course of the robbery Walter Hills, a laundryman who was making his daily call at the restaurant, walked past the office and glanced through the glass side wall thereof. He was headed down the corridor toward the alley carrying his bundle of laundry. He reached the exit to the alley about the same time as defendant, and as Mrs. Phay stood at her office door calling that "it was a holdup and he had a gun." Defendant fired a single shot at Hills, who died almost instantly as the result of the bullet piercing his back and passing through his heart. It is at this point that the evidence shows the only instance of conflict — whether, as Mrs. Phay and Mrs. Paolini testified, defendant passed Hills in the corridor, then turned and fired his gun, with the bullet entering the victim's back because he had turned to face Mrs. Phay as she cried out the alarm; or whether, as a truck driver, likewise a witness for the prosecution, testified, the pistol was discharged before defendant had overtaken Hills in the corridor, with defendant thereupon jumping over his

victim's body and the bag of laundry, and then speeding down the alley.

Defendant was apprehended by the police about an hour and forty-five minutes later that morning as he cowered in the basement of a building which opened off the same alley as Bedell's Restaurant but a few blocks distant therefrom. He offered no resistance to arrest but called out, "I give up. I give up." Defendant was searched by one of the arresting policemen and was found to have $95 in currency on his person. He then took the police to the basement of the Red Hen Café, a few doors down the same alley, where he pointed out a paper bag concealed in the loft and found to contain the balance of the money as well as the gun (a five-chamber pistol, having one expended and four loaded cartridges). At the same time defendant showed the police certain clothing which he had worn in the course of the robbery and homicide at Bedell's Restaurant but which he had later discarded in the basement of the Red Hen Café upon changing to the garments he was wearing when arrested. It appears that defendant had previously worked some five or six months as a kitchen helper at the Red Hen Café; that he had been discharged from such work in May, 1949, because business was slack; and that in the early morning of July 18, 1949, when he had applied at the café about 7:30 o'clock, he had been offered the opportunity to do some odd jobs beginning later that day. Upon further search of defendant in the café basement, the police found a key which, as defendant then stated, fitted a locker at the Greyhound bus depot; and investigation there later revealed a grip packed with defendant's various personal effects. According to the testimony of the police officers, defendant when arrested was nervous and excited, and he stuttered but he was able to answer coherently questions as to his various activities on the morning in question.

Defendant testified in his own behalf at the trial. He did not deny having committed the robbery and the homicide. However, it was his story that he called at Bedell's Restaurant in the course of looking for employment that morning; that when Mrs. Phay opened her office door, he saw the money on the desk and somehow was impelled to grab it; that as he was making his escape down the corridor, he tripped, his gun was discharged, and the bullet entered the body of Hills, who was preceding him down the corridor and who was instantly killed.

It appears that Hills for some nine months had been servicing Bedell's Restaurant as one of the business establishments on his linen supply route and had been regularly calling there each day about 8 o'clock in the morning. A cook at the Red Hen Café at the time of defendant's employment there testified at the trial that Hills customarily made his daily morning call at the café about 9:30 o'clock in the morning; that the laundry pickup was in the kitchen where defendant worked, and that while defendant's "time of employment" did not begin until 11:30 o'clock in the morning, "he was always to work . . . earlier than his set time . . . as long as two hours ahead . . . a few times" and that "more than once" defendant was "in the kitchen" at the same time Hills would be there, stopping "five or ten minutes" to "have a cup of coffee." Defendant testified that he had never seen Hills before the day of the homicide.

 It was the theory of the prosecution that defendant had planned the robbery, consistent with his having stored his packed suitcase in a locker at the Greyhound bus depot; that he shot Hills because he realized Hills had recognized him in the course of the robbery, and that to avoid apprehension for his crimes, he had changed certain clothing in the basement of the Red Hen Café and was awaiting an opportunity to make his escape to the bus depot and leave town when he was arrested. On the other hand, it was defendant's claim that he was in a highly nervous state of mind at the time of the commission of the robbery, that the killing of Hills was accidental, and that there was no question of trying to avoid identification because he did not know and had never before seen Hills. However, regardless of these opposing considerations in the record as to whether the killing was intentional or accidental, it is indisputably established that it was committed in the perpetration of the robbery, so that the offense is murder of the first degree. (Pen. Code, § 189; *People* v. *Williams,* 20 Cal.2d 273, 283 [125 P.2d 9], and cases there cited; *People* v. *Rye,* 33 Cal.2d 688, 693 [203 P.2d 748].)

 The first alleged error is concerned with the remarks of the trial judge in the course of the *voir dire* examination as interfering with the exclusive province of the jury under the law in fixing the punishment in the event of a finding of defendant's guilt of the crime of murder in the first degree. It is defendant's contention that such remarks created

the impression that only the extreme penalty would be appropriate upon such determination rather than a choice between the alternative punishments of life imprisonment or death. (Pen. Code, § 190.) But regardless of the rule that "under ordinary circumstances, unless a party aggrieved by [a] claimed [impropriety] on the part of the trial judge promptly" urges his objection thereto, "his claims in that regard will not be considered on appeal" (*People* v. *Galuppo*, 81 Cal.App.2d 843, 849 [185 P.2d 335]; see, also, 8 Cal.Jur. 510, § 522; *People* v. *Savage*, 66 Cal.App.2d 237, 245 [152 P.2d 240]) and without quoting the various passages cited by defendant as constituting improper comment by the trial judge, it is sufficient here to say that a fair and complete reading of the entire *voir dire* examination shows that the trial judge's participation therein was directed solely to (1) the ascertainment of whether the jurors had any fixed opinions with regard to acting on a case which might involve the imposition of the death penalty (see *People* v. *Hoyt*, 20 Cal. 2d 306, 318 [125 P.2d 29]) and (2) the clarification of various questions asked by counsel in that connection (50 C.J.S. 1059, § 276d) as well as certain applicable legal principles. Moreover, the trial judge prefaced his interrogatories with the general statement to the prospective jurors that "in the event [the jury] should find the defendant guilty of the crime of murder of the first degree, . . . then . . . it [was] the duty . . . [of] the jury [to] fix the penalty at either death or imprisonment for life," and he then queried if "any . . . now in the jury box . . . [were] conscientiously opposed to the imposition of the death penalty?" In addition, at various stages throughout the *voir dire* examination (1) the trial judge repeatedly referred to the "duty . . . of the jury to fix the penalty" as between the alternative choices, and in so doing, to "take into consideration all of the facts and circumstances surrounding [the] slaying"; (2) both counsel as well as the trial judge told the jurors that they would be informed on the law to be applied after they had heard the evidence in the case; and (3) the jury was later plainly instructed on its function to determine from the evidence and within the exercise of its discretion "whether the defendant [if] found guilty of murder of the first degree [should] be punished by death or imprisonment for life." In the light of such explicit instruction defendant unavailingly cites the case of *People* v. *Sainz*, 162 Cal. 242 [121 P. 922], where the jury was expressly limited in its consideration of the evidence

to a finding of whether or not the defendant was ''guilty of the offense with which he [was] charged [murder]'' and was told that ''it was not for [it] to consider the penalty prescribed for the punishment of the offense at all'' (page 246), obviously ''grave and manifest error'' under the law (page 247) and cause for reversal of the judgment of conviction. Likewise wholly distinguishable are the cases cited by defendant where, under the court's charge, the jury's exercise of its discretion, in relieving from the extreme penalty, was correlated with the existence of ''some extenuating fact or circumstance in the case.'' (*People* v. *Bollinger,* 196 Cal. 191, 205 [237 P. 25]; *People* v. *Kolez,* 23 Cal.2d 670, 671 [145 P.2d 580]; *People* v. *Lindley,* 26 Cal.2d 780, 793 [161 P.2d 227]; *People* v. *Williams,* 32 Cal.2d 78, 85 [195 P.2d 393].) No such instruction was given in this case. Accordingly, as these observations upon the state of the present record plainly indicate, there is no merit to defendant's challenge of the propriety of the trial judge's remarks in the *voir dire* examination as amounting to an interference with the jury's discretionary power in fixing the punishment.

█ Nor is there any force to defendant's second alleged error that certain statements made by the district attorney in his argument transcended the scope of the evidence. To this point defendant complains of the district attorney's assertion (1) that ''beyond any doubt'' defendant and Hills ''came to know'' one another; and (2) that according to the testimony of one of the employees at the Red Hen Café, ''there were occasions, many occasions . . . when those men were in the kitchen of that small establishment together.'' At the trial defendant made no objection to these remarks nor did he request the court to admonish the jury to disregard them. But irrespective of this consideration, it is clear that the challenged remarks constituted proper argument on the part of the district attorney pursuant to the prosecution's theory that defendant's killing of Hills was ''to avoid identification.'' Thus it appears that while the aforementioned employee at the Red Hen Café said that he ''could [not] estimate the number of times'' that defendant and Hills ''were in the kitchen'' together, it was ''more than once'' during the months that defendant worked in that café. Such testimony furnished justification for the district attorney's assailed statements coincident with his right ''to discuss the merits of [the] case'' and ''to state fully his views as to

what the evidence shows, and as to the conclusions to be fairly drawn therefrom." (*People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1]; see, also, *People* v. *Hoyt, supra,* 20 Cal.2d 306, 318.) Of course, such statement by the district attorney was in conflict with defendant's claim that he "never saw [Hills] in [his] life before," but that was an evidentiary consideration for ultimate determination by the jury.

■ Defendant finally complains of the trial court's failure to instruct the jury that "the evidence of the oral admissions" of defendant should be viewed "with caution." (Code Civ. Proc., § 2061, subd. 4; *People* v. *Thomas,* 25 Cal. 2d 880, 890 [156 P.2d 7]; *People* v. *Cornett,* 33 Cal.2d 33, 39-40 [198 P.2d 877].) While the cited cases hold that such instruction should have been given regardless of the fact that defendant did not request it (see, also, *People* v. *Koenig,* 29 Cal.2d 87, 94 [173 P.2d 1]), the record in this case is such that it is highly improbable that any different verdict would have been returned by the jury had the omission not occurred. (*People* v. *LeTourneau,* 34 Cal.2d 478, 492 [211 P.2d 865].) Defendant's identification and his commission of the crimes as charged were established by the prosecution by evidence adduced from eyewitnesses and independently of his admissions. Moreover, upon apprehension by the police on the morning in question and their search of his person, defendant directed the arresting officers to the place where he had concealed the balance of the stolen money and the gun which he had used as the murder weapon. At the trial one of these officers detailed at considerable length defendant's various admissions made at the time of his arrest, and defendant, upon taking the witness stand, made no attempt to deny these incriminating statements. This latter observation fully distinguishes the present record from the principal cases cited by defendant: *People* v. *Thomas, supra,* where the defendant's "asserted admission" to a deputy sheriff that "*he had planned to do this before* . . . was the most direct and important evidence in the trial on the question of degree of the offense" (p. 891) and *People* v. *Cornett, supra,* where the prosecution likewise placed strong reliance on certain admissions of the defendant in classification of the degree of the homicide and defendant denied having made such admissions (pp. 38-39). Furthermore, in both the Thomas and Cornett cases, several erroneous instructions were given which were deemed to have affected prejudicially the jury's consideration of the evidence in adjudicating the offense to be murder in the first degree,

and in view of the cumulative effect of the errors the respective judgments of conviction were reversed.

A reading of the record here shows that defendant had a fair and impartial trial, and that his claims of prejudicial error cannot be sustained.

The judgment of conviction and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.