[Crim. No. 13408. Fourth Dist., Div. One. Oct. 19, 1982.]

THE PEOPLE, Plaintiff and Respondent v.
MARK ALBERT McELHENY, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Jeffrey J. Stuetz, Deputy State Public Defender, and Elizabeth A. Anderson for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COLOGNE, J.—Mark Albert McElheny appeals his jury-tried conviction and sentence to prison for robbery and burglary, both with personal use of a firearm (Pen. Code, §§ 211, 459 and 12022.5),[1] and for assault on a peace officer and assault with a deadly weapon, both while armed with a firearm (§§ 245, subd. (b), 245, subd. (a), and 12022, subd. (a)).

On July 17, 1980, McElheny and his accomplice, John Gafney, carried out their plan to rob Marie Callendar's restaurant in Fullerton. Wearing ski masks and using a pistol and shotgun, the gunmen obtained $4,000 from the safe, forced the employees into a walk-in refrigerator, then fled. Fullerton Officer Cecil Reece arrived and saw the two running from the restaurant's back door. Reece ordered them to halt, saying "police, freeze," and "drop the rifle."

---

[1]All statutory references are to the Penal Code unless otherwise specified.

Gafney responded by firing a shotgun blast at the officer, hitting him in the face, arm and chest. As he collapsed, Officer Reece emptied his revolver at Gafney, killing him.

McElheny's response to the officer's order was to run and hide behind a bush. About one hour after the shooting, officers found him and his loaded .22 caliber revolver which he had tried to hide in a nearby planter box.

McElheny contends physical mistreatment of him was undisputed and destroyed the voluntary nature of his confessions. He asserts after he was beaten, pushed into his dead friend's body and terrorized by police dogs, the giving of *Miranda* rights did not purge the fear and make his confessions voluntary; and the later in-court confession was fruit of the poisonous tree.

The robbery and shooting took place about midnight of Thursday, July 17, 1980. About one hour later, officers found McElheny and took him into custody. He testified without contradiction that while he was handcuffed and lying down at the scene of arrest, he was "beaten a little bit" by being struck with a billy club all over the body, including the testicles; taken to Gafney's body, pushed face down into it and told "this is your murder, punk"; and taken by the hair next to the window of a police car containing barking dogs by an officer who said he ought to put McElheny in the car with the dogs. Later, McElheny was transported to the police station where, at about 3:40 a.m. on the 18th, other officers gave him his *Miranda* rights which he waived, and questioned him. McElheny admitted his participation in the Marie Callendar robbery as well as his involvement in another robbery at Reuben's restaurant which took place on July 11.[2] In doing so, McElheny was cooperative, softspoken and sober during the conversation. He did not request counsel or ask that the conversation terminate. No promises of leniency or threats attended the interview, and McElheny was not injured to the degree he could not understand his rights.

In making its ruling on the motion to suppress McElheny's statement, the trial court stated, in part: "With respect to the physical mistreatment, it is uncontroverted and the only thing in the record is to the effect that he was physically abused. Certainly while that type of conduct cannot be condoned, as counsel suggested, it's not unrealistic to believe that under those circumstances that one or more officers may be inclined to feel that street justice should be meted out. It would be naive to believe that that has never occurred. But two things are significant. Number one, the defendant has told us that another officer stopped them. He told them that they were violating his rights. So he was not entirely without help or without aid in that respect.

---

[2]The jury found him not guilty of the Reuben's robbery charge after McElheny testified he had learned of its details from his friend Gafney, whose family he was trying to protect by falsely confessing his own guilt to the police.

"Secondly, the record is also uncontroverted or there's nothing in the record to indicate that there's any relationship between, direct relationship between the statements and the abuse, if any, that was meted out. The conversation occurred in an entirely different setting. He was in the police station in the presence of two officers unarmed, in a room. In reviewing the tenor of the conversations that occurred in which the admissions were made, I had no impression that any threats were made at that time or that he was acting from anything other than his own free will. The greatest factor probably, if one were to guess or speculate on it, working on the defendant's mind at that time was probably the death of his companion. But throughout the conversation he is apparently well composed. He's not sobbing. He's not hysterical. He's coherent. He can respond to the questions, has no difficulty in understanding. He's not complaining of physical abuse. It's also significant to note that in a number of instances, he controlled the interview to the extent that he set the parameters or the limits of the conversation. Specifically, he told them he would not talk about the pending case, as I've referred to before. And in another instance, they were discussing the possibility of him giving up names of persons that may be involved in other robberies and that the officers would treat the source of their information with confidentiality. In other words, to insure that it wouldn't be traced to him. He nonetheless held the line there. But he apparently was capable of making decisions as to what he would reveal and what he would not reveal and stuck to his guns to that extent.

"So accordingly, your motion to exclude the statements is denied."

█ Our function is to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]). █ It is the prosecution's burden to show voluntariness beyond a reasonable doubt (*id.* at p. 608). The prosecution here failed in its burden.

In reaching this conclusion, we keep in mind the following principles: " 'If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure. . . .' [Citations.] In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be taken into account. [Citations.]

"Factors of significance in assessing the effect of circumstances on the voluntariness of a confession include the mental level and intelligence of the accused [citations]; the amount of physical abuse or psychological pressure to which the accused was subjected [citations]; the existence of a prior coerced

confession [citations], and the existence of any break in the chain of events from the initial application of coercion to the time of confession sufficient to insulate the latter from the coercive influences. [Citations.]" *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572-573 [75 Cal.Rptr. 642, 451 P.2d 74].)

Moreover, where one confession is found to have been coerced and it is followed by another, " '*[t]he law presumes the subsequent confession to have been made and influenced by the same hopes and fears as the first,* and this presumption continues until it is affirmatively established by the prosecution that the influences under which the *original confession* was made had ceased to operate before the subsequent confession was made. [Citations.]' " (*People* v. *Sanchez, supra,* 70 Cal.2d 562, 574-575, quoting from *People* v. *Johnson* (1871) 41 Cal. 452, 454-455; italics in original.)

It has been said, "any physical mistreatment of the accused destroys the voluntary nature of such a statement [confession] and renders it worthless in a court of justice" (*People* v. *Williams* (1942) 20 Cal.2d 273, 285 [125 P.2d 9]). *Williams* earlier pointed out "[t]he mistreatment by police officers of a person arrested and charged with crime cannot be justified under any circumstances . . . ." (*Ibid.*)

■ Under the *Williams* rationale, the total circumstances involving the crime scene events and the uncontradicted abuse attending McElheny's arrest, it cannot be said the prosecution proved beyond a reasonable doubt the statements the eighteen-year-old McElheny made two or three hours later were voluntary.

Unlike cases such as *Stroble* v. *California* (1952) 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599], having similar facts although the arrest scene abuse was much less severe,[3] there are here no facts such as entirely separate or repeated confessions which suggest strongly McElheny had concluded, "quite independently of any duress by the police, 'that it was wise to make a clean breast of his guilt.' " (*Stroble* v. *California, supra,* 343 U.S. 181, 191 [96 L.Ed. 872, 881, 72 S.Ct. 599, 604].) We cannot conclude as the court did in *Stroble* that the confession was not the result of coercion. Our conclusion is to the contrary on the basis of the uncontradicted evidence of coercion applied to McElheny at the time and place of arrest.

All of McElheny's inculpatory statements except his testimonial confession were brought out by custodial interrogation within hours, then four days of his

---

[3]The officer kicked Stroble in the shins once or twice and held his blackjack under Stroble's nose while verbally drawing his attention to it. The officer also, by inaction, permitted a bystander to slap Stroble in the face, knocking off his glasses. Later, while surrounded by 19 officers, he confessed.

mistreatment at arrest. On this record there is no proof beyond a reasonable doubt the statements were voluntary. The confession having been used against McElheny at trial, automatic reversal is mandated (*People* v. *Jimenez, supra,* 21 Cal.3d 595, 606, 612-614).

We address certain of McElheny's other contentions for the assistance of the court on retrial. He contends there was instructional error.

■ A defendant has the "constitutional right to have the jury determine every material issue presented by the evidence" (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; overruled on another point in *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913]). On the duty to instruct *sua sponte,* the rule is, "even in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial. [Fn. omitted.] 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People* v. *Flannel* (1979) 25 Cal.3d 668, 680-681 [160 Cal.Rptr. 84, 603 P.2d 1].) Moreover, "[a] trial court has no *sua sponte* duty to give amplifying or clarifying instructions in the absence of a request where the terms used in the instructions given are 'commonly understood by those familiar with the English language'; it does have such a duty where the terms have a 'technical meaning peculiar to the law.'" (*People* v. *Kimbrel* (1981) 120 Cal.App.3d 869, 872 [174 Cal.Rptr. 816], quoting from *People* v. *Anderson* (1966) 64 Cal.2d 633, 639-640 [51 Cal.Rptr. 238, 414 P.2d 366].)

■ McElheny first points out the trial court gave no instruction defining an assault as in CALJIC No. 9.00, which states in part an "assault is an unlawful attempt coupled with the present ability, [and the general criminal intent,] to apply physical force upon the person of another." Though the court gave other appropriate instructions pertaining to aggravated assault, none specifically defined "assault." Instead, the other appropriate instructions merely use the word "assault." A use note to CALJIC No. 9.03 [Assault with a Deadly Weapon or by means of Force Likely to Produce Great Bodily Injury], which was given by the trial court, states: "Instruction 9.00 (1980 Revision), Assault—Defined, and 3.30 should be given with this instruction." The first sentence of the use note to CALJIC No. 9.00, the omitted definitional instruction, states: "This instruction should be given in assault prosecutions."

What an assault is in law was a general principle of law governing the assault charges against McElheny. The legal definition of an assault is not one commonly understood by those familiar with the English language. Rather, as the

language of CALJIC No. 9.00 attests, "assault" indeed has a technical meaning peculiar to the law. Since it cannot be said "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions" (*People* v. *Sedeno, supra,* 10 Cal. 3d 703, 721), there was instructional error warranting reversal of the assault charge. The instruction must be given on retrial.

■ McElheny next contends the trial court should have *sua sponte* instructed on the use of excessive force during arrest. He claims the lack of instruction as in CALJIC No. 9.57 [Use of Excessive Force by Officer] and CALJIC No. 5.30 [Self-defense Against Assault] and the deletion of the phrase "unless unreasonable or excessive force is being used to make the arrest" from the language of CALJIC No. 9.55 [Use of Reasonable Force to Make Arrest—Duty to Submit] was prejudicial because the jury could have found guilt even though the officer was using excessive force and the firing of the shotgun was done in self-defense or in response to the officer's unreasonable use of force. In addition, he claims prejudicial error in failing to include in the given CALJIC No. 9.58 instruction [Unlawful Arrest or Unlawful Detention—Not Performance of His Duties] a statement that an officer who uses excessive force in making an arrest is not engaged in the performance of his duties, and in failing to give CALJIC No. 9.54 [Mechanics of Arrest].

A trial court should instruct *sua sponte* on a theory of the case where there is evidence deserving consideration by the jury on that theory. As stated in *People* v. *Flannel, supra,* 25 Cal.3d 668, at pages 684 to 685: "A trial court should not, however, measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, a task exclusively relegated to the jury. If the evidence should prove minimal and insubstantial, however, the court need not instruct on its effect. [Fn. omitted; citations.] In other words, '[t]he court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.' [Citation.] We likewise note that 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' [Citations.]"

Our review of the record here reveals no evidence of the use of excessive force by the officer, much less substantial evidence. The fact Officer Reece did not remember whether he identified himself as a police officer, when combined with McElheny's testimony he heard gunshots but not rifle shots after someone yelled "stop," and a witness' testimony she heard someone say "drop it, damn it, I told you to drop it," followed by some gunshots, raises no inference the officer shot first so as to permit a conclusion there was excessive force used to effect the arrest. This evidence relied on by McElheny to show excessive force does not even reach the level of "minimal and insubstantial" (*People* v. *Flannel, supra,* 25 Cal.3d 668, 684). Evidence supporting a theory the officer used

excessive force is nonexistent here. Thus, the excessive force instructions were properly omitted.

■ The same conclusion attends McElheny's assertion there was evidence supporting a theory of self-defense based on the idea the officer shot without first identifying himself as an officer. The cited evidence is at most "minimal and insubstantial," and does not support giving the instruction *sua sponte*.

We observe, however, CALJIC No. 9.54, relating to the mechanics of arrest, should have been given for the jury's enlightenment. The failure to give it here, however, gives rise to not even a reasonable possibility of a different result (cf. *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], requiring reasonable probability of a different result before an error is reversible).

■ The trial court's omission of the phrase "engaged in the performance of his duties" in connection with one of the instructions relating to the assault with a deadly weapon on a peace officer charge (§ 245, subd. (b)) also was error. The trial court properly instructed on the elements of this form of assault by giving CALJIC No. 9.50.5 which makes clear the jury must find the defendant knew or reasonably should have known the officer "was engaged in the performance of his duties." In the related instruction on union of act and intent, the court did not include the quoted phrase.[4] Given these circumstances, the error was not reversible, but on retrial of the charge, the phrase should be included in the adaptation of CALJIC No. 3.31.5 [Concurrence of Act and Intent] just as it was properly included in the CALJIC No. 9.50.5 instruction defining the assault on a peace officer crime.[5]

■ McElheny contends the trial court's instruction that a lawful arrest may be made without a warrant if the person in fact committed a felony deprives him of due process of law because the jury would presume a lawful arrest from the mere fact a felony had been committed. The instruction of which he complains is from CALJIC No. 9.53,[6] which reflects Penal Code section 836, subdivision

---

[4]Adapted CALJIC No. 3.30.5, as given: "In the crime charged in Count 5 of the Information, namely Assault with a Deadly Weapon on a Peace Officer, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator and unless such mental state exists the crime to which it relates is not committed.

"In the crime of Assault w/a Deadly Weapon on a Peace Officer, the necessary mental state is that the perpetrator knew or reasonably should have known that the person assaulted was a peace officer."

[5]CALJIC No. 9.50.5, in part: "That such person [the person who committed the assault] knew or reasonably should have known that the peace officer was engaged in the performance of his duties."

[6]CALJIC No. 9.53, as given: "*A lawful arrest may be made by a peace officer without a warrant if the person arrested has in fact committed a felony although its commission was not in the presence of the officer.*

"A lawful arrest may be made by a peace officer without a warrant whenever he has

2, authorizing a peace officer to make an arrest without a warrant "[when] a person arrested has committed a felony, although not in his presence."

McElheny's theory is a "jury could first determine whether a felony in fact had been committed, and resolving that issue against a defendant, find a lawful arrest without determining whether there was probable cause for arrest or deciding whether the officer used excessive force. In short, once the jury found that a felony had been committed it would automatically find a valid arrest." Moreover, he asserts "section 836 is also a violation of due process in that it cannot be said with substantial assurance that the presumed fact an arrest of a particular person is lawful, is more likely than not to flow from the proved fact, that a felony had in fact been committed, on which it depends.

The problem with McElheny's analysis is the instruction merely states a rule of *law* pertaining to the validity of arrests; it does not operate to create a presumption of *fact* from the existence of other facts. The cases on which McElheny relies, *People* v. *Burres* (1980) 101 Cal.App.3d 341 [161 Cal.Rptr. 593], *People* v. *Bedolla* (1979) 94 Cal.App.3d 1 [156 Cal.Rptr. 171], and *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], all of which involved presumptions of fact used to determine a defendant's intent, are inapposite. Accordingly, his argument based on the theory of an invalid presumption of fact is without support and is otherwise unmeritorious.

 Finally in connection with McElheny's arguments about errors in the instructions, it should be observed, as the Attorney General properly concedes, the jury should be instructed in any retrial that McElheny cannot be convicted of both the assault with a deadly weapon on a peace officer and its lesser included offense of assault with a deadly weapon (*People* v. *Moran* (1970) 1 Cal.3d 755, 763 [83 Cal.Rptr. 411, 463 P.2d 763]).

 McElheny contends the trial court erred prejudicially in admitting into evidence photographs of the wounded police officer; the photographs were irrelevant and had an inflammatory effect on the jury. He complains of two photographs, one showing the officer's face covered with blood and his mouth bandaged, and the other showing his head somewhat cleaned up but still having blood on his forehead and wounds showing. He asserts it was uncontroverted the officer was shot in the face and arms by shotgun pellets and the officer himself described his injuries to the jury. Citing *People* v. *Hall* (1980) 28

---

reasonable cause to believe that the person arrested has committed a felony, whether or not a felony has in fact been committed.

"The term 'reasonable cause' as used in these instructions means such a state of facts or circumstances confronting the officer at the time of the arrest as would lead a man of ordinary caution or produce to believe and conscientiously entertain a strong suspicion that the person arrested had committed a felony." (Italics added.)

Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826], at page 152, he concludes the evidence became irrelevant and inadmissible as having to do with a fact not genuinely in dispute.

"Admission of photos of victims lies within the discretion of the trial court unless their probative value is clearly outweighed by their prejudicial effect. [Citations.]" (*People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605 P.2d 830].) Cruz made an argument similar to McElheny's, i.e., that the circumstances of the crime were admitted and thus probative value was lacking. The Supreme Court rejected the argument, noting the photos were relevant to malice (*id.* at p. 253).

A case closely analogous to McElheny's is *People* v. *Jones* (1981) 119 Cal.App.3d 749 [174 Cal.Rptr. 218], involving a charge of assault with a deadly weapon on a peace officer, though with the additional charge of infliction of great bodily injury (§ 12022.7) which was not made here. (The jury found Jones did not inflict great bodily injury.) The Court of Appeal in *Jones* upheld admission of a photo showing the officer's face bleeding and another showing the face in a cleansed condition. Although *Jones* relied on the section 12022.7 allegations to show the relevancy of the photos to the issues in the case, it observed the prosecution was not required to rely solely upon verbal descriptions for proof of the severity of the wounds (*id.* at p. 754). Here, the allegations include the charge the assault was "by means of force likely to produce great bodily injury," and the *Jones* rationale is equally applicable to this case.

Under the precedent directly applicable to the question of the admissibility of photographs, we cannot consider the admission of the photos here to be an abuse of discretion. We note *Hall, supra,* 28 Cal.3d 143, on which McElheny relies, involved a willingness to stipulate to an ultimate issue in the case, the defendant's status as a person having been convicted of a felony for purposes of ex-felon in possession of concealable firearm charges against him (§ 12021). No stipulation to an ultimate fact, e.g., the officer suffered great bodily injury, was offered here.

Having reached this conclusion, we need not discuss McElheny's other theories of suppression pertaining to alleged improper delay in his arraignment until Tuesday, July 22 (see *People* v. *Thompson* (1980) 27 Cal.3d 303, 330 [165 Cal.Rptr. 289, 611 P.2d 883]) and deprivation of his right to counsel's presence during questioning. The latter contention is based on the fact he had counsel in another case involving a charge of possessing stolen property pending at the time of his arrest. He claims that case was "closely related" because he used the very gun involved in the possession of stolen property charge in this Marie Callendar robbery (see *People* v. *Boyd* (1978) 86 Cal.App.3d 54, 60 [150 Cal.Rptr. 34]).

Moreover, since the judgment must be reversed in its entirety, we need not consider McElheny's assertions of error in the matter of good time/work time credits (§ 4019). We do wish to observe, however, we find no error in the denial of all good time credit due to the escape attempt. With respect to the work time credit, however, we believe a proper apportionment should be made according to proof showing he is not entitled to the work time credit in whole or in part (see *People* v. *Johnson* (1981) 120 Cal.App.3d 808, 814-815 [175 Cal.Rptr. 59]).

Judgment reversed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 5, 1983.