Filed 7/15/13  P. v. Dinh CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID VINH DINH,<br><br>    Defendant and Appellant. | G045883<br><br>(Super. Ct. No. 10WF3219)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorney General, for Plaintiff and Respondent.

\*        \*        \*

A jury found defendant David Vinh Dinh guilty of attempted voluntary manslaughter (Pen. Code, §§ 192, subd. (a), 664, subd. (a); all further unspecified statutory references are to the Penal Code), assault with a firearm (§ 245, subd. (a)(2)), and false imprisonment by violence (§§ 236; 237, subd. (a)). The jury also found Dinh personally used a firearm while attempting to commit voluntary manslaughter. (§ 12022.5, subd. (a).) Dinh contends the trial court erred by allowing the prosecutor to impeach him with involuntary statements. He also argues the court erred by failing to give the jury the option to convict him of the lesser offense of shooting a firearm in a grossly negligent manner (§ 246.3, subd. (a)). For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of December 28, 2010, Fountain Valley Police Officers Antonius Spangler and Marco Avila responded to a report of a possible vehicular burglary. Spangler found 17-year-old Dinh sitting in a tree trimming truck. Avila recognized Dinh from a February 2009 incident at Fountain Valley High School when Dinh, dressed as a "ninja," came to school carrying an Airsoft plastic pellet gun and "spy" gear. Dinh's comments and demeanor led Avila to conclude Dinh suffered from "mental issues."

After speaking with Dinh for about 15 minutes, the officers concluded Dinh again appeared to be suffering from serious psychological problems. Dinh spoke of a "recruit[ment]" mission and stated he needed to find a "contact" who had information for him. Dinh explained he had searched a nearby mailbox looking for a local newspaper that might offer "clues" about where next to go. He pointed to an imaginary "getaway

2

motorcycle" he believed was adorned with American flags. Because Dinh was a minor, the officers turned him over to his father and advised him to obtain psychiatric assistance for his son.

About an hour later, Brian Briscoe, preparing for work, heard someone kick in the front door to his apartment. He found Dinh in the hallway pointing a realistic looking Airsoft gun at him and shouting "get down on the ground." Briscoe initially complied, but when Dinh turned his back Briscoe got up and approached Dinh, who turned in time to press his gun against Briscoe's neck and order him to "[g]et down on the f-ing ground," and ask, "Do you want to die today?" When Dinh walked down the hallway to search the apartment, Briscoe escaped and called 911. He described Dinh as "crazy," "weird," and "off a hair . . . ."

Briscoe advised the police he kept approximately 20 firearms in the apartment, including a MAK-90 assault rifle, with a five-round magazine, and ammunition that was not under lock and key. He also kept yellow earplugs to prevent hearing loss when shooting his firearms.

Officer Richard Nilos arrived first at the scene, followed by 10 to 12 officers and detectives. Nilos advised his colleagues the suspect had access to firearms and ammunition inside the apartment, and might be the person with psychological problems officers had contacted earlier. Dinh's father also arrived at the scene and advised officers his son suffered from bipolar disorder.

Officers spread out around the building, and Nilos, armed with a rifle, moved behind an oak tree in a grassy area. Detective Pat Estes went to the side of the building, and Sergeant Kurt Ulrich concealed himself behind bushes and a fence. Nilos

3

and Ulrich wore uniforms, while Estes wore plainclothes.  The police identified themselves and ordered Dinh to come out and drop his gun.

Dinh briefly emerged from the upstairs apartment brandishing Briscoe's assault rifle.  Nilos directed Dinh to drop the weapon, but Dinh stepped back into the alcove and switched off the rifle's safety.  Nilos moved from behind the tree.  According to the officers, Dinh emerged again with the rifle in firing position, advanced towards Nilos, who now stood in the grassy area without cover.  Nilos told him to drop the gun, but Dinh fired the weapon at Nilos from about 70 feet away.  Dinh fired a second shot, which struck a swimming pool gate.  Nilos fired his rifle at Dinh, and then ran back to the oak tree for cover.  Dinh continued firing in Nilos's direction and then retreated to the stairwell area.  Investigators later found four cartridge casings fired from a MAK-90.

Ulrich fired his shotgun three times at Dinh.  After the third shot hit him, Dinh dropped the firearm and fell back into the bushes.

Officers took Dinh into custody, and paramedics rushed Dinh to the hospital.  He suffered approximately 38 gunshot wounds in the shootout and was in "acute medical distress."  A paramedic asked Dinh what he did to get shot.  Dinh replied, "I shot at him."

Dinh and his father testified about Dinh's history of mental problems, which developed around ninth grade.  Dinh had problems sleeping, spoke rapidly, lacked concentration, exhibited depression, and once attempted suicide.  He had behavior problems at school.  He often dressed up as a soldier and became fascinated with espionage.  He had been prescribed antipsychotic medication, but had stopped taking it at some point in the months leading up to the shooting.

Dinh testified that on the morning of December 28, 2010, after the officers released him to his father, he found a "training video" in his satchel, which led him to believe that his "mission wasn't complete." He packed up some items, snuck out of the house, and got on his bike. At Briscoe's apartment building, Dinh saw some construction tape blocking access to a stairwell and determined "X mark[ed] the spot" for him to conduct espionage activities.

He entered Briscoe's apartment believing a friend from school lived there, and hoped to find his next clue or contact. At first he believed Briscoe was part of the training mission or his next contact. He chased Briscoe to a bedroom, and told him to "get out of here. Do you want to get hurt or something?" As Dinh walked around the apartment looking for more clues, Briscoe fled. Dinh found the guns and feared Briscoe "might be a terrorist or arms dealer" and might return to "protect his investment," so he loaded the MAK-90 for his "own personal safety" and put in the earplugs to protect his hearing in case of a confrontation. Suffering a "panic attack," Dinh hid in a closet for about 30 minutes because he feared Briscoe would come back to harm him.

He heard a voice call "David, David, come out. We can talk," but he did not hear officers announce their presence, and denied knowing police were outside. Once he emerged from the apartment with the rifle, he saw a "figure behind a tree, pointing a gun" at him and "felt very threatened." He could not tell who it was because of the distance, shadows, and the tree, but thought it might be Briscoe.

He heard someone yell "something about a gun," so he stepped back and deactivated the weapon's safety mechanism. He fired a "warning shot" that was "up and to the left" of the person. He denied firing a second shot at Nilos, but once Nilos returned fire, Dinh "fired a volley of suppression fire" to "occupy the person" and create the

5

"opportunity to escape." Dinh was shot before he could get back to his bicycle. He did not realize police officers were involved during the shooting and never intended to shoot or kill anyone.

The prosecutor impeached Dinh with statements he made to investigators, who interviewed him at the hospital the day after the shooting. Dinh's pretrial statements contradicted his testimony he did not intend to injure or kill anyone and did not know police officers were present. For example, he stated that with his first shot he "sighted" his target (Nilos) and "started firing," and then "took two steps forward and . . . fired the rest of the magazine off at that plain clothed." He also suggested he armed himself and ignored demands to put down the assault rifle, not for self-preservation, but because he did not want to surrender and planned to flee because he knew breaking into Briscoe's apartment was a "serious legal matter." But other portions of the interview supported Dinh's testimony he took the rifle to protect himself in case Briscoe came back, he did not know officers were present, and did not aim at anyone or intend to kill, firing only a warning shot and "suppressing fire."

Following a trial in July 2011, a jury convicted Dinh of the charges noted above, but acquitted him of attempted murder of a peace officer, assault with a firearm on a peace officer, first degree robbery, and residential burglary. The trial court imposed a prison sentence of 10 years and two months.

6

## II

### DISCUSSION

A.  *The Trial Court Did Not Err in Finding Dinh's Statements Voluntary*

Dinh contends the trial court committed prejudicial error when it found Dinh's pretrial statements to investigators were voluntary and therefore admissible to impeach Dinh's trial testimony. We do not find the contention persuasive.

Fountain Valley Detective Adam Hertenstein and District Attorney Investigator Paul Kelly interviewed Dinh in his hospital room for approximately two hours on the day after his arrest. The prosecutor, however, did not seek to admit the interview during her case-in-chief. Dinh testified at trial, and referred to the interview repeatedly during his direct examination. For example, Dinh acknowledged he had listened to the tape of the interview, reviewed a transcript, and answered every question Hertenstein asked. Dinh believed he was able to express how he perceived events as they unfolded and stood "by everything" he said during the interview. Dinh verified the 96-page transcript his lawyer showed him was the transcript he reviewed before testifying. Dinh's attorney marked both the tape and transcript as defense exhibits.

The prosecutor questioned Dinh without objection about his pretrial interview with Hertenstein, and Dinh's attorney extensively questioned him during redirect examination using a transcript of the interview.

But the day after Dinh had ostensibly concluded his testimony, and after the prosecutor announced she intended to play the audio tape of the interview for the jury, Dinh's attorney advised the court he disagreed with multiple, substantial changes in a revised transcript the prosecutor had just given him. He also stated he wanted to question Hertenstein in front of the jury to establish the officer had intentionally violated Dinh's

7

*Miranda* rights. Counsel emphasized repeatedly he "wanted [Dinh's] statements [at the hospital] in [evidence]," and was "not trying to exclude the evidence." But he argued evidence the officers intentionally violated Dinh's *Miranda* rights supported his theory Fountain Valley police were biased against Dinh and "this was not a fair investigation."[1] Defense counsel proposed not to raise the *Miranda* issue if the prosecutor would agree not to "offer the tape" of the interview into evidence, but the prosecutor stated she wanted the entire transcript in evidence and planned to play the tape during her rebuttal case.

The court therefore held a hearing outside the jury's presence to address Dinh's *Miranda* complaint. Defense counsel explained his motion dealt solely with "whether [the officers] intentionally violated" Dinh's *Miranda* rights. The officers testifying at the hearing acknowledge they knew there was an issue whether Dinh was in custody. Although a sergeant had posted an armed officer outside Dinh's hospital room, the sergeant advised Hertenstein that Dinh was "detained and not arrested" because "we had not – that we weren't taking custody of him, that – at the time if they [the hospital] were to discharge him, that we would still allow him to leave." Hertenstein believed it was a "gray area," but the officers chose not to administer the *Miranda* advisement, and ignored the request of Dinh's mother not to question her son.

After the officers testified at the 402 hearing, defense counsel objected to "the entire statement coming in under the Fourth, Fifth, Sixth, Eighth Amendment Due Process Clause of the United States Constitution, because I believe it was an intentional violation of my client's rights. So I don't think that statement should come in. I don't think it should be played. I don't think she should be allowed to play that taped

---

[1] The prosecutor had earlier objected on relevance grounds when defense counsel attempted to elicit from Dinh that Hertenstein did not advise Dinh of his rights. Defense counsel argued "it goes to bias," but the trial court sustained the objection after an unreported sidebar conference.

8

conversation at all." Defense counsel later acknowledged both lawyers had questioned Dinh while reading off a transcript of the interview and counsel clarified he "did not object to [the prosecutor's] asking the questions that she did."

The court concluded Dinh was in custody during the interview and therefore was entitled to have his pretrial statements excluded because investigators violated his *Miranda* rights and Welfare and Institutions Code section 625.[2] But the court also concluded Dinh's statements were voluntary and admissible as impeachment evidence. The court noted the officers did not display their weapons, "they never threatened him. They never coerced him. They never made promises. They never promised him things about what would happen, what wouldn't happen." The court also observed there was no "torture, deprivation of food, deprivation of toilet facilities, deprivation of sleep, physical abuse." The court stated "it appeared to the court based on everything the court's been exposed to, it was somewhat cordial. They allowed the defendant to speak to the mom. The mom came and went as she wanted."

The parties subsequently agreed to instruct the jury that to "avoid further delays in the trial," neither a tape nor a transcript of the interview would be received into evidence, rather "each side [would] read from" the transcript and the jury was told to "accept the reading of that question or response as" accurately reflecting what was said unless a party objected to the wording of the question or response.

---

[2]     Section 625 provides where a minor is taken into temporary custody on the ground there is reasonable cause for believing he is a person described in section 602, the officer shall advise the "minor that anything he says can be used against him and shall advise him of his constitutional rights, including his right to remain silent, his right to have counsel present during any interrogation, and his right to have counsel appointed if he is unable to afford counsel."

9

Dinh resumed his testimony and answered more questions about his hospital interview with investigators. The prosecutor and Dinh's attorney often referred to a transcript of the interview in posing their questions. Defense counsel objected occasionally to the form of the prosecutor's question or on other technical grounds, but did not object to any of the prosecutor's questions on the ground Dinh's statements had been coerced. No one played the tape for the jury, or introduced a transcript of the interview into evidence.

Dinh now complains the trial court erred in determining his pretrial statements to Hertenstein were voluntary and therefore the prosecutor could use them to impeach Dinh. But the record reflects trial counsel did *not* object, and indeed had no objection, to Dinh's hospital interview statements per se. He bluntly stated he "wanted [Dinh's] statements [at the hospital] in [evidence]" and was "not trying to exclude the evidence." Counsel lodged his objection solely to prevent the prosecutor from playing the audiotape to the jury. If the court allowed the prosecutor to play the tape, Dinh wanted the jury to know the officers had deliberately violated his *Miranda* rights to show the Fountain Valley Police was biased against him. The trial court denied the prosecutor's request to play the tape, but the parties continued to ask questions based on a transcript of the interview, although neither the tape nor the transcript were admitted into evidence. As noted, the court provided a jury instruction, drafted by the parties, explaining this procedure. Consequently, Dinh's attorney obtained the remedy he requested: the right to elicit from Dinh exculpatory statements Dinh made in the interview and a ruling preventing the prosecution from introducing the entire interview. Under these circumstances, Dinh failed to preserve a claim his pretrial statements to Hertenstein were involuntary; indeed, he first introduced evidence of his statements

10

during his direct examination and relied on those statements to show his lack of criminal intent.

In any event, we have independently reviewed the record and agree with the trial court Dinh's statements were voluntary. (*People v. Maury* (2003) 30 Cal.4th 342, 404 [prosecution must demonstrate by a preponderance of the evidence the statement was voluntary]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033 [appellate court accepts the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported, but independently determines from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained].) The California Supreme Court has held statements obtained via a deliberate *Miranda* violation are not per se involuntary. (*People v. Peevy* (1998) 17 Cal.4th 1184 (*Peevy*); see *Harris v. New York* (1971) 401 U.S. 222, 224, 226; cf. *Missouri v. Seibert* (2004) 542 U.S. 600, 610, fn. 2 [plurality opn.] [noting some police training programs advise officers to omit *Miranda* warnings altogether or to continue questioning after the suspect invokes his rights to obtain possible impeachment evidence].) A confession is considered voluntary if it is the "'product of a rational intellect and a free will.'" (*People v. Holt* (1997) 15 Cal.4th 619, 663.) "'Among the factors to be considered are "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"'" (*People v. Boyette* (2002) 29 Cal.4th 381, 411; *People v. McElheny* (1982) 137 Cal.App.3d 396, 401-402 (*McElheny*).)

Notwithstanding Dinh's youth (17 1/2 years old), medical condition (multiple gunshot wounds and recent surgery), and mental health issues, the record

11

reflects Dinh was an intelligent, articulate, straight "A" student. Investigators did not handcuff Dinh during the interview, nor did they display their weapons. They did not threaten Dinh or make promises to induce him to talk. There was no "deprivation of food, deprivation of toilet facilities, deprivation of sleep, [or] physical abuse." Dinh did not appear to be in pain or distress due to his injuries, nor did he appear to be suffering from any psychiatric issues at the time of the interview. His answers were responsive to the investigator's questions, and, as the trial court observed, the interview appeared "somewhat cordial." The officers allowed Dinh's mother in and out of the hospital room. Dinh exercised free will when he asked her to leave his room so he could continue the interview without her hearing his description of events. Although Hertenstein informed Dinh he was not under arrest, and Kelly explained he was there to investigate the officers' conduct because it was an officer involved shooting, neither suggested to Dinh his statements would or could not be used against him. Nor did they impliedly promise he could speak freely to them without fear of penalty. The totality of factors supports the trial court's conclusion Dinh's statements were voluntary.

The cases Dinh relies on do not compel a different conclusion. In *People v. Neal* (2003) 31 Cal.4th 63, the defendant repeatedly requested to speak with an attorney, but the officer ignored his requests and continued the interrogation. The officer badgered defendant, accused him of lying, informed him "'this is your one chance'" to help yourself and that " 'if you don't try and cooperate . . . . the system is going to stick it to you as hard as they can.'" (*Id.* at p. 68.) Despite these tactics, the defendant did not confess. But after the session ended, the police took him into custody, kept him in jail overnight without access to counsel or other noncustodial personnel and without food, drink, or toilet facilities. The following morning when questioning resumed the

12

defendant confessed. *Neal* concluded "in light of all the surrounding circumstances—including the officer's deliberate violation of *Miranda;* defendant's youth, inexperience, minimal education, and low intelligence; the deprivation and isolation imposed on defendant during his confinement; and a promise and a threat made by the officer—defendant's initiation of further contact with the officer was involuntary, and his two subsequent confessions were involuntary as well." (*Id.* at p. 68.)

In *McElheny*, *supra*, 137 Cal.App.3d 396, the robbery defendant "testified without contradiction that while he was handcuffed and lying down at the scene of arrest, he was 'beaten a little bit' by being struck with a billy club all over the body, including the testicles; taken to [his accomplice] Gafney's [dead] body, pushed face down into it and told 'this is your murder, punk'; and taken by the hair next to the window of a police car containing barking dogs by an officer who said he ought to put [the defendant] in the car with the dogs. Later, [the defendant] was transported to the police station where, at about 3:40 a.m. on the 18th, other officers gave him his *Miranda* rights which he waived, and questioned him." (*Id.* at p. 400.) The appellate court noted "'any physical mistreatment of the accused destroys the voluntary nature of such a statement [confession] and renders it worthless in a court of justice'" and "[t]he mistreatment by police officers of a person arrested and charged with crime cannot be justified under any circumstances." (*Id.* at p. 402.) The court concluded the defendant's statements were involuntary and reversed his conviction.

In *Mincey v. Arizona* (1978) 437 U.S. 385, the defendant "had been seriously wounded just a few hours earlier, and had arrived at the hospital 'depressed almost to the point of coma,' . . . . Although he had received some treatment, his condition at the time of [the] interrogation was still sufficiently serious that he was in the

13

intensive care unit. He complained to [the officer] that the pain in his leg was 'unbearable.' He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. The court described the defendant's condition as "debilitated and helpless," and noted he lost consciousness during the interrogation, which resumed when the defendant awoke. (*Id.* at pp. 399, 401) The interrogating officer ignored the defendant's numerous requests for an attorney, and the nurse suggested the defendant should answer the questions. (*Id.* at p. 399.) The Supreme Court reversed the conviction because the defendant's admissions were not "'the product of his free and rational choice.'" (*Id.* at p.401.)

The foregoing cases are readily distinguishable. In *Neal*, the defendant made involuntary statements after constant badgering, threats, and an overnight jail confinement without food, drink, or other basic necessities. Because Dinh was not placed in jail, subject to badgering, or denied any comforts during his interview, his interrogation bore no resemblance to that described in *Neal*. Nor did Dinh encounter the gratuitous police violence described in *McElheny*. True, Dinh was wounded, but this occurred when Dinh fired his assault weapon at another officer and would not drop the weapon. Moreover, unlike the defendant in *McElheny*, the interview with Dinh occurred the day after he was shot, not two or three hours later. Finally, Dinh was not in the debilitated condition of the defendant in *Mincey*, nor did he repeatedly express a desire not to speak to the officers. In fact, the contrary was true. Dinh appropriately responded to the investigator's questions, expressed no reservation about discussing the case, and there was no evidence his medical treatment clouded his judgment or impaired his decision to discuss the case.

14

There is no need to address Dinh's efforts to distinguish the cases the trial court relied on in determining his statements were voluntary. (*People v DePriest* (2007) 42 Cal.4th 1, 34-36 [statements voluntary although the police failed to read the defendant his *Miranda* rights and continued interrogation after defendant asserted rights]; *People v Jablonski* (2006) 37 Cal.4th 774; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 57-60 [statements voluntary even where police ignored nine requests for an attorney and promised the defendant better jail conditions].) None of Dinh's arguments undermine our conclusion Dinh's statements were not coerced.

B.    *The Trial Court Did Not Err By Refusing to Instruct the Jury on the Lesser Offense of Shooting a Firearm in a Grossly Negligent Manner (§ 246.3)*

Dinh also argues the trial court erred by denying his request to instruct the jury on the offense of discharging a firearm in a grossly negligent manner (§ 246.3) as a lesser offense to attempted premeditated murder of a peace officer. (§ 246.3, subd. (a); CALCRIM No. 970.) Trial counsel conceded section 246.3 was a lesser *related* offense rather than a lesser *included* offense, and there is no right to a lesser related offense instruction under California law. (See *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*).) But he asserted it denied his "client due process of law that the prosecution gets to shape what crimes go to the jury for their decision" and it would force counsel to argue his client "did nothing wrong, when I know he did. So I feel that's unfair."

The prosecution has broad discretion in deciding which charges to bring against a defendant and the "courts do not generally supervise [this] 'purely prosecutorial function.' [Citations.]" (*People v. Ceja* (2010) 49 Cal.4th 1, 7; *People v. Richardson* (2008) 43 Cal.4th 959, 1013.) Due process, however, imposes a sua sponte duty on trial courts to instruct the jury on a lesser *included* offense "when the record contains

15

substantial evidence of the lesser offense, that is, evidence from which the jury could reasonably doubt whether one or more of the charged offense's elements was proven, but could find all the elements of the included offense proven beyond a reasonable doubt." (*People v. Moore* (2011) 51 Cal.4th 386, 408-409.) In contrast, "a trial court has no sua sponte duty to instruct on lesser related offenses." (*People v. Lam* (2010) 184 Cal.App.4th 580, 583; *People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387 ["defendant has no right to instructions on lesser related offenses even if he requests the instruction and it would have been supported by substantial evidence"].) A lesser related offense is one closely related to the charged offense, and where the evidence provides a basis for finding the defendant guilty of the related offense and innocent of the charged offense. (*People v. Babaali* (2009) 171 Cal.App.4th 982, 1000.)

A lesser included offense is defined by one of two tests, the "'elements'" test and the "'accusatory pleading'" test. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) The right of a federal noncapital defendant to obtain instructions on a lesser offense is limited to lesser *included* offenses under the "elements" test, which compares only the statutory definitions of the two crimes. (*Birks*, *supra*, 19 Cal.4th at p. 124.) Dinh concedes he failed to satisfy the elements test. The trial court therefore did not violate his right to due process.

Nothing in *People v. Eid* (2010) 187 Cal.App.4th 859 (*Eid*) assists Dinh. There, the defendant was charged with kidnapping for ransom (§ 209, subd. (a)). *Eid* concluded that offense requires the prosecution prove the victim did not consent to being confined and the defendant did not actually and reasonably believe the victim consented. The trial court erred in failing to instruct on those elements and related defenses. *Eid* did not hold the trial court erred or violated due process by failing to instruct on the *offense*

16

of simple kidnapping, which also requires proof of a lack of consent, but which is not a lesser included offense of kidnapping for ransom because the latter crime does not require asportation. (*Eid, supra,* at pp. 874-875.)

Here, Dinh does not claim the trial court failed to instruct the jury on the elements of attempted murder of a peace officer or attempted voluntary manslaughter. Shooting a firearm in a grossly negligent manner is not a "defense" to these crimes. Dinh's claim of error based on *Eid* fails.

## II

### DISPOSITION

The judgment is affirmed.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

17